Tallulah MORGAN et al., Plaintiffs,

v.

John J. McDONOUGH et al., Defendants.

Civ. A. No. 72–911–G.

United States District Court, D. Massachusetts.

Dec. 23, 1982.

Larry Johnson, Center for Law and Educ., Gutman Library, Cambridge, Mass., Laurence S. Fordham, Foley, Hoag & Eliot, Boston, Mass., for plaintiffs.

Caroline Playter, Boston, Mass., Kenneth Kimberling, Puerto Rican Legal Defense, New York City, for El Comite.

Robert Blumenthal, State Board of Educ., Quincy, Mass., Robert H. Bohn, Jr., Sp. Asst. Atty. Gen., Bohn & Kaplan, Boston, Mass., for State Bd. of Educ.

Steven P. Perlmutter, Asst. Corp. Counsel, Boston, Mass., for Mayor, City of Boston.

James T. Grady, Grady & McDonald, Boston, Mass., for BTU–Boston Teachers Union.

Richard W. Coleman, Segal, Roitman & Coleman, Boston, Mass., for BASAS–Boston Ass'n of School Administrators and Supervisors.

Thayer Fremont-Smith, Choate, Hall & Stewart, Boston, Mass., for Boston Home and School Ass'n.

Martin A. Walsh, Community Relations Service, Boston, Mass., for Community Relations.

Jim Stanton, Acting Staff Director, Citywide Parents' Council/Transition Committee, Boston, Mass., for Transition Committee.

Marshall Simonds, Henry C. Dinger, Goodwin, Procter & Hoar, Boston, Mass., for Boston School Committee and Boston School Dept.

Michael Betcher, Boston School Committee, Maura McGroarty, Boston School Committee, Dept. of Implementation, Nancy Gertner, Silvergate & Gertner, Boston, Mass., Thomas I. Atkins, NAACP Gen. Counsel, N.A.A.C.P. Special Contribution Fund, Brooklyn, N.Y., Wm. Shaw McDermott, McDermott & Rizzo, Boston, Mass., for Concerned Black Educators of Boston.

## MEMORANDUM AND ORDERS OF DISENGAGEMENT

GARRITY, District Judge.

*Introduction*

The vestiges of pervasive and long-standing purposeful discrimination in public education are neither simply nor quickly eradicated. This court found in 1974 that the constitutional rights of minority students in the Boston public schools had been violated. In subsequent years, the court formulated and has actively participated in implementing an appropriate remedy in this case to cure the lingering effects of unconstitutional racial discrimination.

The ultimate goal of any remedy for a violation of minority students' educational rights under the Fourteenth Amendment must be to produce a school system which operates in compliance with constitutional standards without the ever present prospect of judicial intervention. These orders mark an appropriate new phase in the lengthy and complicated process toward effecting a complete remedy in this case. The court

now embarks on a transitional course of disengagement as it commences a process of returning to the parties the responsibility for complying with the requirements of the Constitution.

In the orders that follow, the court distinguishes between two distinct elements of the ongoing remedial process in Boston's public school system. At the foundation of the remedy are the substantive orders entered throughout the life of the case. Such orders include standards for student assignments and transfers, the assignment of teachers and staff, student transportation and discipline, and parent participation, among many others. Having been affirmed by the Court of Appeals,[1] these orders constitute "the law of the case" and provide the standards which, if fully complied with, can yield an adequate remedy for the past constitutional violation. The goal of these orders is to create a unitary system from the dual system which had existed. All such substantive orders must remain in place.

That aspect of the remedial process which is affected by these orders is its mechanism of administration. This court has directly overseen compliance with the substantive requirements of the remedial process for the past eight years. The parties and the court have gained significant experience. If there is not, as defense counsel have suggested, a "common law" defining what the orders particularly require, there is, at least, a workable common understanding of what the orders mean. Judicial interpretation of the orders, therefore, is now far less necessary than during the earlier phases of the remedial process. Thus, the remedial process, in our opinion, will now be more effectively pursued under an administrative structure which employs the experience and the common understanding gained over the years, and which provides the parties with an opportunity to confront and resolve issues related to curing the constitutional violation without immediate and inevitable judicial participation.

Pursuing the goal of augmented party autonomy in voluntarily fulfilling the requirements of remedial orders, the court has addressed four essential issues: monitoring defendants' compliance with outstanding orders, resolving disputes arising under substantive orders, judicial authority should voluntary efforts fail, and procedures governing possible modification of outstanding orders.

These orders provide new responsibilities for the Massachusetts Board of Education for monitoring defendants' compliance and facilitating dispute resolution under outstanding substantive orders. By lodging these functions in the State Board, the court seeks to create a transitional supervisory structure which can enable the court to determine whether the school system will operate according to the substantive elements of a constitutionally required remedy without continuous judicial oversight. A clear indication that the system will be so administered is a prerequisite to further judicial withdrawal.[2]

The court regards the adversarial judicial process as inhibitive of an ideally functioning school system in which compliance with constitutional standards is both voluntary and a matter of course. The process of dispute resolution prescribed by these orders is intended to create a framework for facilitating the consensual resolution of disputes related to the desegregation remedy. This framework is not a substitute for judicial action, but a screen prior to judicial

---

1. *See,* e.g., *Morgan v. Kerrigan,* 1 Cir.1975, 509 F.2d 618 (affirming provisional remedy regarding faculty transfers and hiring); *Morgan v. Kerrigan,* 1 Cir.1976, 530 F.2d 401 (affirming basic remedial order); *Morgan v. Kerrigan,* 1 Cir.1976, 530 F.2d 431 (affirming order regarding faculty recruiting and hiring); *Morgan v. O'Bryant,* 1 Cir.1982, 687 F.2d 510 (affirming orders regarding layoffs of faculty); and *Morgan v. McDonough,* 1 Cir.1982, 689 F.2d 265 (affirming orders regarding student assignments).

2. A logical next step, after success in this transitional phase, might be to remove this case from the "active docket" as did Judge McMillan in *Swann v. Charlotte-Mecklenberg Board of Education,* 67 F.R.D. 648, 649 (W.D.N.C., 1975).

action, to ensure that all possible efforts have been expended toward a satisfactory resolution.

The procedures for dispute resolution issued today are not significantly different from those proposed by the State Board's draft orders in several important respects. Both versions place initial responsibility for responding to a claim of noncompliance, and potentially resolving a dispute, with the school defendants. Both versions authorize the State Board to intervene if the parties' initial efforts toward resolution fail. The court has, however, modified the State Board's draft for three reasons. First, a less formal, nonadversarial procedure whose goal is consensus will not compromise the due process rights of the parties. Second, the court adopts the modified version with the hope that a process whose goal is consensual resolution will, in fact, promote consensual resolution. This conceptualization of dispute resolution is consistent with the court's abiding aim of entering a consent decree in this case. Although the parties have not yet found common ground for resolving all issues at once, the goal remains, and the structure of dispute resolution established by these orders provides a process for achieving consensus on an issue by issue basis. Third, because formalized procedure is kept to a minimum, and because the parties retain autonomy to evaluate their interests in the context of constitutional requirements, the changes made by the court in the State Board's final version, in our opinion, more nearly replicate a system in which there is no external control. Such a replication is necessary to determine whether the system will function according to constitutional requirements without judicial intervention.

The orders also contain an ultimate judicial stopgap. Should the process of consensual dispute resolution fail on a particular issue, a party may seek judicial resolution of the dispute. The court retains a similar role with respect to other provisions of these orders. This aspect of ultimate judicial authority underscores the transitional nature of the administrative procedures herein prescribed.

The procedures governing modification of outstanding orders reflect the two fundamental principles underlying the orders issued today, viz., that all prior substantive orders are to remain in place and that the basis for judicial disengagement is consensual compliance with constitutional requirements. By requiring substantial, if not unanimous, agreement among the parties with any proposed modification, the court assumes that existing orders, so long the "law of the case," and indeed, continuously modified and refined throughout the years, provide an optimal remedy for the constitutional violation. At the same time, however, the court recognizes that a proposed modification, if supported by a significant coalescence of the parties, could well promote the goal of consensual compliance, and therefore merits judicial consideration.

The court could not have embarked upon this transitional course without the extraordinary efforts, cooperation, and good will of numerous participants in the process of desegregation. The court is particularly grateful to the Massachusetts Board of Education, which will undertake much of the central role which the court anticipates need no longer be primarily judicial, and John H. Lawson, Commissioner of Education for the Commonwealth of Massachusetts, for his leadership and determination to ensure the success of this new phase of the desegregation remedy.

The court also acknowledges the cooperation and dedication of President Jean Sullivan McKeigue and her colleagues on the current Boston School Committee, and expects them to continue to work toward achieving the goal of a school system operated routinely and voluntarily according to constitutional mandates. There is no reason, at this time, to anticipate any retrenchment from the School Committee's increasingly helpful collaboration, and the court trusts that when a new, restructured School Committee is constituted in January of 1984, the progressive dynamics of consensual compliance with outstanding orders will continue.

Finally, the court cannot overlook such recent extrajudicial developments as the formation of a Committee on Education by the Boston Chamber of Commerce to implement the "Boston Compact" between the Chamber and the school department and the reconstitution of parental involvement in the form of the Citywide Parents Council and local parent councils. Supplementary resources and programs from the business, educational and cultural communities, together with the renewed support of parents with unprecedented and hard-earned knowledge and experience can, we believe, contribute substantially to fashioning a school system in which excellent education is provided in a racially nondiscriminatory fashion.

The orders that follow are designed to afford the Boston public school system an opportunity for autonomous compliance with constitutional standards. It is with confidence that this opportunity will be realized that the court issues these transitional orders for the modified administration of outstanding substantive orders.

### I. Existing Orders

Unless modified pursuant to the provisions of section VII, below, all provisions of the May 10, 1975 desegregation plan and other orders entered in these proceedings, shall remain in effect.

### II. Parties

A. *Original Parties.* The original parties to this proceeding are (1) the certified class of all black children enrolled in the Boston Public School System and their parents ("plaintiffs" or "party plaintiffs") (now represented by both Attorney Johnson of the Center for Law and Education and Attorney Atkins of the NAACP Special Contribution Fund); (2) the Boston School Committee, and the Superintendent of the Boston Public Schools ("school defendants"); (3) the Commissioners of the Public Facilities Commission, the Director of the Public Facilities Department, and the Mayor of Boston ("city defendants"); and (4) the Massachusetts Board of Education and the Commissioner of Education for the Commonwealth of Massachusetts ("State Board").

B. *Plaintiff-Intervenor.* The intervening party with full status as a plaintiff is *El Comite de Padres Pro Defensa de la Educacion Bilingue* ("Plaintiff-Intervenor").

C. *Limited Intervenors.* Boston Teachers Union (BTU), Concerned Black Educators of Boston (CBEB), Boston Association of School Administrators and Supervisors (BASAS), and Boston Home and School Association (BHSA) were granted status as intervening parties to protect their limited interests peripheral to the primary issue between plaintiffs and defendants. These limited intervenors shall have a continuing role to the following extent:

1. BTU

a. BTU may participate in the dispute resolution process provided for in § V only regarding issues related to procedures for teacher hiring, transfer, and promotion.

b. BTU may propose modification of outstanding orders and participate in negotiations pursuant to § VI only regarding issues related to procedures for teacher hiring, transfer, and promotion.

c. BTU may pursue the remaining issues related to the opinion of the First Circuit Court of Appeals of August 27, 1982, *Morgan v. O'Bryant,* 687 F.2d 510.

d. The parties shall provide BTU with copies of all papers and documents prepared pursuant to § V of these orders.

2. CBEB

CBEB may participate to the same extent as the BTU.

3. BASAS

a. BASAS may participate in the dispute resolution process provided for in § V only regarding issues related to the rights of headmasters, principals, and other supervisory personnel.

b. BASAS may propose modification of outstanding orders and participate in negotiations pursuant to § VI only regarding issues related to the rights of headmasters, principals, and other supervisory personnel.

c. The parties shall provide BASAS with copies of all papers and documents prepared pursuant to § V of these orders.

#### 4. BHSA

BHSA is dismissed as an intervening party in this case, the school committee having recognized the Citywide Parents Council (CPC) as the representative of "the concerns of all parent groups" in this litigation. BHSA may continue to participate as amicus curiae regarding modifications of outstanding court orders pursuant to § VI, and particularly regarding beacon and linkage proposals "should they be introduced by the defendants" or other principal parties. *See Morgan v. McDonough,* 1 Cir.1982, 689 F.2d 265, 279.[3]

D. All further references to "parties" in this order include only the original parties and plaintiff-intervenor, unless otherwise noted.

### III. *Department of Implementation*

A. The Department of Implementation (DI) shall retain the organizational structure required by court orders and shall be staffed at a minimum in accordance with the roster of positions submitted by the school defendants and approved by the court in June, 1981. The School Committee and the Superintendent, through the DI and in accordance with relevant court orders, shall have primary responsibility for:

1. planning and implementing (subject to prompt review and approval by the State Board with respect to compliance with relevant court orders)[4]
   a. all student assignments;
   b. all school capacities;
   c. all program locations;
   d. all student transportation;
   e. all space/program matrices;[5]

2. internally monitoring the school department's compliance or noncompliance with orders entered in this case, and advising school department officials and personnel as to such compliance or noncompliance;

3. maintaining external liaison operations on behalf of the School Department, including supplying information, upon reasonable request, to parties, limited intervenors, the Citywide Parent Council (CPC) and others with respect to student assignments, student attendance, student discipline, school capacities, program locations, faculty and administrative staffing, and student transportation;

4. analyzing proposals for changes related to the desegregation remedy;

B. The DI shall cooperate with the State Board and assist it in carrying out its responsibilities under this order. The DI shall periodically report to the State Board regarding the results of the DI's internal monitoring of the School Department's compliance or noncompliance with orders entered in this case.

C. The school and city defendants shall permit and enable the DI to have the use of the school department computer at all reasonable times and to have prompt access to all information within the school department relevant to the discharge of the DI's responsibilities under this and prior court orders.

### IV. *Monitoring by State Board of Education*

A. *Areas of Monitoring and Applicable Standards.*

1. The Massachusetts Board of Education (State Board) shall have responsibili-

---

**3.** The court finds that BHSA has no remaining legal interest regarding the administration or modification of orders in this case. Indeed, the duration and extent of BHSA's participation in this case have significantly exceeded the court's intentions at the time BHSA was granted status as an intervening party. With respect to the interests of parents and school personnel, its participation has become redundant.

**4.** Any disagreement between the school defendants, through the DI, and the State Board, in these matters will be resolved by the court with the assistance of the court's expert as in prior years. The court will not review such plans if the school defendants, through the DI, and the State Board, are in agreement. This provision refers only to planning and implementation under existing orders. Plans for modifying outstanding orders must be pursued according to the process prescribed in § VII of these orders.

**5.** The DI's primary responsibility for planning and implementing space matrices includes those for special needs students.

ty, concomitantly with its obligations under state statutes, for monitoring the school defendants' efforts and activities toward fulfilling their affirmative duty to remedy all vestiges of their violation of the educational rights under the Fourteenth Amendment of minority students in the Boston public schools.

2. Specifically, the State Board shall monitor the school and city defendants' compliance with the court's desegregation orders entered in the following areas:[6]

a. Student assignments, school capacities and program locations;

b. Faculty and administrative staff;

c. Special desegregation measures at specific schools;

d. Special education;

e. Bilingual education;

f. Vocational and occupational education;

g. Student transportation;

h. Construction, renovation, and closing of school facilities;

i. School safety and security;

j. Student discipline;

k. Institutional pairings;

l. Court-ordered parent and student organizations.

3. The State Board also shall monitor the defendants' compliance with all terms of voluntary measures in the aforesaid areas which have not been formalized as court orders, and with all terms of agreement reached pursuant to the process of dispute resolution. (See § V C 3 and § V D 2). Such voluntary measures include, for example, voluntary special desegregation measures at Burke and Dorchester High Schools.

B. *Monitoring Powers and Responsibilities of the State Board of Education.*

1. The State Board shall have prompt access to all information and data needed to determine whether defendants are complying with the orders and agreements referred to above, and shall receive the full cooperation of school defendants and the Department of Implementation.

2. The State Board may require the Superintendent to prepare and file with the State Board reports relevant to a remedy in this case, as well as those regularly filed with the clerk under outstanding orders of this court; and parties, the limited intervenors, and the CPC shall have reasonable access to them.

3. The State Board shall submit a written report to the court, parties, and the CPC by January 15 and July 15 of each year this order remains in effect, summarizing its activities pursuant to § IV A during the previous six months. The first such report shall be filed by July 15, 1983. The State Board may also submit special monitoring reports to the court, parties, limited intervenors and the CPC when, in the judgment of the State Board, circumstances warrant.

4. The powers and responsibilities granted herein to the State Board shall be administered by the Commissioner of Education for the Commonwealth of Massachusetts and his or her designees in the Massachusetts Department of Education.

C. *Determination of Noncompliance.*

1. If in the course of its monitoring the State Board determines that a defendant has not complied with court orders, the State Board shall, after having communicated informally with said defendant toward achieving compliance, inform all parties of its findings, if compliance has not been achieved.

2. A party plaintiff, or limited intervenor to the extent permitted by § II C, may pursue such issue of noncompliance pursuant to the framework for dispute resolution. *See* § V, below.

V. *Dispute Resolution*

A. *Purpose.* The court hereby establishes a process of negotiation whose objective is agreement rather than adjudication. Such negotiations provide the parties with an opportunity, independent of the court, to

---

**6.** See Appendix I for catalogue of applicable orders in each area.

ascertain their mutual interests and determine appropriate actions within the confines of constitutional requirements. The court anticipates that negotiations conducted in good faith can significantly reduce the necessity of further judicial participation.

B. *Notification of a Defendant.* A party plaintiff, or a limited intervenor to the extent permitted by § II C, believing that either the school defendants or the city defendants have not complied with a court order in this case, or with the terms of voluntary agreements related to a desegregation remedy not formalized as court orders, shall send a letter to said defendant setting forth the substance and the legal foundation of its belief and the action it believes should be taken to correct the alleged violation.

C. *Negotiation toward Resolution.*

1. Said defendant shall reply in writing (i.e., the defendant's initial written response) no later than two weeks * after receiving such letter from the complaining party. The defendant's reply shall specify the course of action it intends to take, if any, including the identity of persons responsible for taking such action, a timetable for accomplishing such action, and a brief written statement of the reasons for its decision. Said defendant also shall contemporaneously provide a copy of the plaintiff's letter and its reply to all other parties, including the State Board, the CPC and the limited intervenors to the extent appropriate under § II C.

2. Within one week after the complaining party receives said response, unless the dispute has been informally resolved in the interim, interested parties, including the limited intervenors to the extent permitted by § II C, or their authorized representatives, shall meet at a time and place agreed upon or, if not agreed upon, at a time and place designated by the State Board, and commence a series of negotiations for the purpose of resolving the dispute.

3. If the participating parties resolve the dispute, after the initial meeting for negotiation or after any other negotiating session held within two weeks after the date when the complaining party received defendant's initial written response, they shall draft a joint report of their agreement and provide a copy to the State Board, the CPC, any nonparticipating parties and the limited intervenors within one week from the date of agreement. The State Board shall monitor compliance with all such agreements. (See § IV A 3).

4. If the parties fail to reach agreement after meeting and negotiation within two weeks after the date when the complaining party received defendant's initial written response, the parties shall either jointly or separately forward copies of all relevant documents to the State Board within three weeks after the date when the complaining party received defendant's initial written response.

D. *Mediation by the State Board.*

1. Upon request by one or more of the parties accompanying their submission of documents to the State Board, the State Board shall mediate further discussion among the interested parties to the dispute, and endeavor to facilitate agreement. The State Board may request mediating assistance from the Community Relations Service. *See* 42 U.S.C. §§ 2000g et seq.

2. If the interested parties reach agreement within three weeks from the date on which the State Board received the request for mediating assistance, the State Board shall draft a form of agreement, to be signed by the interested parties within one week from the date of agreement, and monitor their compliance. (See § IV A 3). The State Board shall provide copies of such agreement to all other parties, the CPC and the limited intervenors.

3. If such mediation fails to produce agreement within three weeks from the date on which the State Board received

---

* See Appendix II for illustrative timetables.

the request for mediating assistance, the State Board shall prepare a report detailing its efforts and the interested parties' positions, and shall draft a recommendation of resolution. This report shall be filed with the court within four weeks from the date on which the State Board was asked to intervene.

4. The State Board's recommendation of resolution shall bind the parties unless a motion is filed pursuant to the next paragraph.

E. *Judicial Action.*

1. Within two weeks from the date on which the State Board files its recommendation of resolution, a party may file a motion with this court requesting *de novo* consideration of the issue.

2. A party, believing that the State Board has failed to comply with its obligations under these or other orders, and after consultation with the State Board for the purpose of achieving compliance, may file a motion with this court seeking judicial consideration of the issue.

VI. *Modification of Outstanding Orders*

Except in an emergency, the court will not entertain motions by any party for modifications of existing orders, including this order, unless the following conditions have been met:

A. The modifications proposed in such motions have been previously presented to all other parties, the limited intervenors to the extent required by § II C, and the CPC, and made the subject of negotiations under the auspices of the State Board.

B. The modifications proposed in such motions, if unrelated to the rights of teachers or administrators, have been endorsed by at least three of the following parties: (1) plaintiffs represented by either Attorney Johnson or Attorney Atkins; (2) plaintiff-intervenors; (3) school defendants jointly; (4) city defendants jointly; or (5) the State Board; and if related to the rights of teachers or administrators, have been endorsed by at least four of the following parties: (1) plaintiffs represented by either Attorney Johnson or Attorney At-

kins; (2) plaintiff-intervenors; (3) school defendants jointly; (4) city defendants jointly; (5) the State Board; or (6) either BASAS or BTU.

C. The modifications proposed in such motions:

1. are shown by the moving party, in supporting memoranda and affidavits, to be necessary in light of changed circumstances since entry of the order sought to be modified;

2. are detailed, complete, and include an analysis of their impact on the educational rights of minority students under the Fourteenth Amendment;

3. are ripe for hearing and decision by the court;

4. are not inconsistent with relevant decisions by the Supreme Court of the United States and federal statutes and regulations; and,

5. are filed no later than December 15 of the year preceding the school year in which they are proposed to take effect if they pertain to student assignments; and no later than reasonable regarding all other matters.

VII. *Extraordinary Costs*

A. City defendants shall compensate the State Board for its extraordinary costs incurred in its monitoring efforts under § IV above, its dispute resolution activities under § V above, and its coordination of negotiations under § VI above. Extraordinary costs for purposes of these orders are defined as reasonable and necessary costs for services which would not be performed but for the requirements of these orders.

B. Said extraordinary costs shall be paid from a separate account, to be established by the city defendants as of January 3, 1983 and maintained every City of Boston fiscal year thereafter in which the present order applies, in the amount of no less than $90,-000; provided, however, that said account shall be maintained in the amount of no less than $45,000 for the period January 1, 1983 through June 30, 1983. The establishment of said separate account shall not reduce or

increase the appropriation to which School Defendants are entitled under Massachusetts Statutes of 1936, Chapter 224, as amended.

C. The State Board may draw directly from said account by submitting an itemized invoice to the City Auditor. A copy of said itemized invoice shall simultaneously be filed with the court. The City Auditor shall promptly approve and process each itemized invoice submitted by the State Board pursuant to this section, unless the city defendants contest said invoice in writing to the Commissioner of Education within five days of receipt of said invoice. The State Board and city defendants shall thereafter have five days to resolve any dispute with respect thereto. If the State Board and city defendants cannot resolve their differences within the stated time period, the State Board shall bring the matter to the court's attention for resolution.

D. Contracts for extraordinary costs involving consultant or other contractual services shall be prepared on the standard Commonwealth of Massachusetts contract form "03". A copy of said contract form shall be provided to city defendants by the State Board. Procurement notices for all said consultant or other contracts in excess of $2,000 shall be posted in the City Record of the City of Boston. Copies of all consultant or other contracts in excess of $2,000 shall be submitted to the Corporation Counsel for the City of Boston, who shall notify the Commissioner of Education in writing within five days of any grounds City Defendants may have for contesting said consultant or other contract. If the State Board and City Defendants cannot resolve any issues relating to the award of the contract within five days of the receipt of said written notice, the City Defendants shall bring the matter to the Court's attention for resolution.

7. The court recognizes that this catalogue may be incomplete. Orders of limited but continuing applicability, issued either in written form or from the bench, may have been overlooked. The court, *sua sponte* or upon petition of a party, may add any such order discovered in

VIII. *South Boston High School*

In accordance with the opinion issued by the United States Court of Appeals for the First Circuit on August 27, 1982, a hearing is hereby scheduled for May 20, 1983 at 2:00 p.m. to consider the status of the special measures regarding staff transfers at South Boston High School, contained in this court's order of June 25, 1981. Motions on this subject may be filed on or before May 3, 1983, and responses on or before May 17, 1983.

IX. *Procedural Orders*

A. This order shall become effective on January 3, 1983.

B. At any time after January 1, 1985, a party making a prima facie showing that the administrative process prescribed by these orders has been adequately implementing the remedy in this case without judicial participation, may move this court to determine whether further judicial withdrawal is appropriate.

C. A party making a prima facie showing that the defendants have complied completely with outstanding orders in this case and have eliminated all vestiges of the dual system may move this court to determine whether plaintiffs' rights have been fully vindicated.

## APPENDIX I

### CATALOGUE OF ORDERS APPLICABLE IN EACH AREA SUBJECT TO MONITORING BY THE MASSACHUSETTS BOARD OF EDUCATION [7]

1. *Student Assignments, School Capacities and Program Locations.* Student assignments and transfers shall continue to be made according to the standards contained in the following orders:

a. Student Desegregation Plan, May 10, 1975, pages 71–79.

the course of future events to the list of orders herein contained. Similarly, further orders entered hereafter in this litigation will be incorporated where appropriate as applicable monitoring standards.

b. Memorandum and Orders Modifying Desegregation Plan, May 3, 1976, pages 16–19.

c. Memorandum and Orders Modifying Desegregation Plan, May 6, 1977, pages 22–27.

d. Memorandum and Orders as to Kindergarten Desegregation, August 12, 1977.

e. Memorandum and Further Orders Modifying Desegregation Plan, March 21, 1978.

f. Memorandum and Further Orders as to Student Assignment Procedures for 1978–79, March 21, 1978.

g. Further Orders as to Student Assignment Procedures for 1978–79, March 30, 1978.

h. Further Orders as to Student Assignment Procedures for 1979–80, April 16, 1979.

i. Order of March 24, 1982, with attachment, allowing percentages by grade level.

2. *Faculty and Administrative Staff.* The desegregation of faculty and administrative staff shall be implemented according to the standards contained in the following orders:

a. Order on Faculty Desegregation, July 31, 1974.

b. Order on Hiring, July 31, 1974.

c. Memorandum and Orders on Faculty Recruiting and Hiring, January 28, 1975.

d. Memorandum and Amended Order on Teacher Assignments and Transfers, August 20, 1975.

e. Order for Desegregation of Administrative Staff, February 24, 1976.

f. Special Order Regarding Promotional Rating Procedures for Community Superintendents, July 7, 1977.

g. Memorandum and Further Order on Faculty Recruiting and Hiring, July 5, 1978.

h. Modification of Administrative Desegregation Orders, January 27, 1981.

i. Conditional Order Modifying Faculty Desegregation Orders, June 2, 1981.

j. Bench Order Regarding Administrative Desegregation, July 9, 1981.

3. *Special Desegregation Measures at Specific Schools.* Special desegregation measures at specific schools shall be implemented according to the standards contained in the following orders:

a. Memorandum and Orders Modifying Desegregation Plan, May 3, 1976, pages 20 and 25, to the extent that the enumerated schools remain in operation.

b. Memorandum and Orders Modifying Desegregation Plan, May 6, 1977, pages 25 and 43–44, to the extent that the enumerated schools remain in operation.

c. Memorandum and Orders Modifying Desegregation Plan, March 21, 1978, page 6.

d. Bench Order of April 20, 1982 regarding Hispanic Bilingual Program, Charlestown High School.

4. *Special Education.* Desegregation of special education programs shall be implemented according to the standards contained at page 5 of the Student Desegregation Plan dated May 10, 1975.

5. *Bilingual Education.* Desegregation of bilingual education programs shall be implemented according to the standards contained in the following orders:

a. Student Desegregation Plan, May 10, 1975, pages 4–5, 44–45, 48–49, 70, 73–74.

b. Memorandum and Orders Modifying Desegregation Plan, May 6, 1977, pages 23 and 27.

c. Memorandum and Further Orders Modifying Desegregation Plan, March 21, 1978, page 5.

6. *Vocational and Occupational Education.* Desegregation of vocational and occupational education programs shall be implemented according to the standards contained at pages 69 and 70 of the Student Desegregation Plan, dated May 10, 1975, and the Unified Plan for Occupational and Vocational Education, as revised and filed with the Court on July 27, 1978.

7. *Student Transportation.* Transportation shall be provided according to the standards contained at pages 80–83 of the Student Desegregation Plan, dated May 10, 1975.

8. *Construction, Renovation and Closing of School Facilities.* Construction, renovation and closing of school facilities shall occur according to the standards contained in the following orders:

　a. Interlocutory Order of June 21, 1974.

　b. Student Desegregation Plan, May 10, 1975, pages 6–7.

　c. Memorandum and Orders Modifying Desegregation Plan, May 6, 1977, pages 37–40.

　d. Further Memorandum and Order as to Unified Facilities Plan, August 15, 1979.

　e. Orders Relating to UFP, March 21, 1980.

　f. Supplemental Order re UFP, April 2, 1980.

　g. Order on Joint Defendants' Motion for Adoption, May 11, 1981.

9. *School Safety and Security.* School safety and security shall be provided according to the standards contained in the following order: Order on Motion for Relief Concerning Security, December 17, 1974.

10. *Student Discipline.* Student discipline shall be enforced according to the standards contained in the Order Approving Addition to Code of Discipline, January 9, 1975.

11. *Institutional Pairings.* Institutional pairings shall continue according to the standards contained at pages 50 through 58 of the Student Desegregation Plan, dated May 10, 1975.

12. *Court-Ordered Parent and Student Organizations.* Court-ordered parent and student organizations shall operate according to the standards contained in the following orders:

　a. Memorandum and Order Establishing Racial Ethnic Councils, October 4, 1974.

　b. Student Desegregation Plan, May 10, 1975, pages 86–100.

　c. Supplemental Order to August 24 Order re Citizen Participation Group, November 8, 1976.

　d. Memorandum and Further Orders as to Citizen Participation Groups, September 1, 1977.

　e. Memorandum and Further Orders as to Citizen Participation Groups (III), September 15, 1978.

　f. Order as to Monitoring Guidelines, May 5, 1980.

　g. Student Amalgamation Plan.

　h. Memorandum and Semi-Final Orders on the Structure of Citizen Participation in the Desegregation Process, July 20, 1982.

　i. Memorandum and Further Orders as to Parent Councils, August 25, 1982.

## APPENDIX II

### DISPUTE RESOLUTION: ILLUSTRATIVE TIMETABLE

#### Hypothetical A

Tuesday, February 1, 1983　Complaining party sends letter to a defendant.

Friday, February 11, 1983　Defendant responds in writing to complaining party. Deadline was Tuesday, February 15, 1983. *See* § V C 1.

Monday, February 14, 1983　Complaining party receives defendant's response.

Wednesday, February 16, 1983　After consultation by telephone, parties agree to meet on Friday, February 18, 1983, for first negotiating session. The deadline for the first session was Monday, February 21, 1983. *See* § V C 2.

Friday, February 18, 1983　Initial meeting for negotiation held. Substantial progress is made toward resolution, but differences remain. The parties schedule a second meeting for negotiation for Wednesday, February 23, 1983.

Wednesday, February 23, 1983　Dispute is resolved. Deadline for resolution of dispute before stage of State Board participation was Monday, February

28, 1983, two weeks after the complaining party received defendant's initial response. *See* § V C 3.

Monday, February 28, 1983 Parties send jointly drafted copy of agreement to State Board. Deadline for sending such copy was Wednesday, March 2, 1983, one week from date of agreement. *See* § V C 3.

### Hypothetical B

Assuming that the dispute was not resolved on February 23, 1983, further activity toward resolution might have taken the following course consistent with § V of these orders.

Wednesday, February 23, 1983 New problems develop. Parties schedule a negotiation session for Monday, February 28, 1983, the deadline of the period of negotiation independent of mediation by the State Board. *See* § V C 4.

Monday, February 28, 1983 The dispute remains unresolved. The parties gather together all relevant documents and agree to request mediation by the State Board. The documents and request are forwarded to the State Board.

The deadline for forwarding such documents and request was Monday, March 7, 1983, three weeks after the date when the complaining party received the defendant's initial written response. *See* § V C 4.

Wednesday, March 2, 1983 The State Board receives the request to intervene. After consultation by telephone, the State Board arranges a meeting among the parties for mediated negotiation on Monday, March 7, 1983.

The deadline of this period of mediated negotiation is Wednesday, March 23, 1983, three weeks after the date on which the State Board received a request for mediating assistance. *See* § V D 3.

Monday, March 7, 1983 State Board mediates further discussion among the parties. The parties fail to reach agreement, but schedule another mediated session for Monday, March 14, 1983.

Monday, March 14, 1983 During mediated session, dispute is resolved.

Friday, March 18, 1983 The State Board provides copies of the form of agreement to the parties. The parties return signed copies to the State Board. The deadline for signing such form of agreement was Monday, March 21, 1983. *See* § V D 2.

### Hypothetical C

Assuming that the dispute was not resolved on March 14, 1983, further activity toward resolution might have taken the following course consistent with § V of these orders:

Monday, March 14, 1983 Final mediated session scheduled for Monday, March 21, 1983, the deadline of the period of negotiations mediated by the State Board. *See* § V D 3.

Monday, March 21, 1983 Dispute remains unresolved.

Friday, March 25, 1983 State Board files a recommendation of resolution with the court. The deadline for filing such recommendation was Wednesday, March 30, 1983, four weeks from the date on which the State Board received the request to intervene. *See* § V D 3.

Thursday, April 7, 1983 A party files a motion with this court requesting *de novo* consideration of the issue. The deadline for filing such motion was Friday, April 8, 1983, two weeks from the date on which the State Board filed the recommendation of resolution.