**Tallulah MORGAN et al., Plaintiffs,**

**v.**

**John A. NUCCI et al., Defendants.**

**Civ. A. No. 72–911–G.**

United States District Court,
D. Massachusetts.

Sept. 3, 1985.

Robert Pressman, Center for Law & Education, Cambridge, Mass., Laurence S. Fordham, Foley, Hoag & Eliot, Boston, Mass., for plaintiffs.

Caroline Playter, Kehoe, Doyle, Playter, Novick & Strimaitis, Boston, Mass., Kenneth Kimerling, Puerto Rican Legal Defense & Education Fund, Inc., New York City, for El Comite.

Robert Blumenthal, State Board of Educ., Quincy, Mass., for Joan Entmacher, Asst. Atty. Gen., Com. of Mass., Boston, Mass., for State Bd. of Educ.

Steven P. Perlmutter, Asst. Corp. Counsel, City Law Dept., Boston, Mass., for Mayor and City of Boston.

James T. Grady, Grady, Dumont & Dwyer, Boston, Mass., for BTU–Boston Teachers Union.

Richard W. Coleman, Segal, Roitman & Coleman, Boston, Mass., for BASAS–Boston Ass'n of School Administrators and Supervisors.

Henry C. Dinger, Goodwin, Procter & Hoar, Boston, Mass., for defendants.

Martin A. Walsh, Community Relations Service, Dept. of Justice, Boston, Mass., for Community Relations.

Lucille Koch, Evalena Higginbottom, Acting co-Executive Directors, Citywide Parents Council, Boston, Mass., for Transition Committee.

Marshall Simonds, Henry C. Dinger, Goodwin, Procter & Hoar, Boston, Mass., for Special Counsel, Boston School Committee and Boston School Dept.

Michael Betcher, Boston School Committee, Boston, Mass.

Shirley Burke, Director of ELU, Boston School Committee, Dept. of Implementation, Boston, Mass.

Nancy Gertner, Silvergate, Gertner, Baker & Fine, Boston, Mass., Grover G. Hankins, Gen. Counsel, N.A.A.C.P. Special Contribution Fund, Thomas I. Atkins, Brooklyn, N.Y., for Concerned Black Educators of Boston.

## MEMORANDUM AND ORDERS ON UFP

GARRITY, District Judge.

### Introduction

The dilapidated condition of many Boston schools has been an obstacle to their desegregation and a continuing concern of all parties to these proceedings. The opening section of the court's remedial orders, in 1975 stated:

> The children of second and third generation white ethnic families suffered as the schools located within their residential enclaves came to reinforce rather than reduce the educational distance between their neighborhood and access to the larger society. Black and other minority children, meanwhile, suffered even greater educational deprivations as the schools they attended were the most crowded, the oldest, the least well maintained, and the most poorly staffed the school committee could offer.

*Morgan v. Kerrigan,* (D.Mass.1975) 401 F.Supp. 216, 223, aff'd (1 Cir.1976) 530 F.2d 401, cert. denied (1976) 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386.[1] A report by Superintendent Wood to the school committee in 1979 stated:

> History has bequeathed us with a wide disparity of facilities, as well as educational programs, and no amount of rationalization can obscure the fact that we

---

1. See also, the liability decision in this case reported at *Morgan v. Hennigan,* (D.Mass.1974) 379 F.Supp. 410, aff'd (1 Cir.1974) 509 F.2d 580, cert. denied (1975) 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449.

desperately need major investments in rehabilitation and construction to reduce existing differences.

A letter to the mayor by Superintendent Spillane in 1985 stated:

The disgraceful physical condition of our school buildings can no longer be tolerated.

The court's authority to order renovations for such schools is derived from its primary responsibility to eradicate the dual system which resulted in segregation.[2] As the Court of Appeals for the Eighth Circuit has pointed out, "relating the remedy to the violation pursuant to *Milliken II* does not require a finding that each [aspect of remedy] at issue has in the past been 'infected with the discriminatory bias of a segregated school system' [citation omitted]. It is sufficient to determine that the remedial program is directed to cure the general condition offending the Constitution." *Liddell v. State of Missouri,* (8 Cir.1984) 731 F.2d 1294, 1315 n. 18, *cert. denied* (1984) —— U.S. ——, 105 S.Ct. 82, 83 L.Ed.2d 30. "Improving the quality of integrated schools consequently promotes parental acceptance of desegregation, and promotes the remedy's success." *Id.* at 1314. This is particularly so with respect to plans which rely to a considerable extent upon voluntary parent and student choices of magnet schools, special programs and other options.

## I.

A long-range facilities plan is essential to desegregation in the Boston public schools under both the court-ordered student desegregation plan and the new experimental assignment plan being implemented this year in districts 3 and 4. The condition of a school building has a strong impact on its ability to receive assigned students or to hold them, once assigned. Under the Boston plan, a community district school is obligated to receive and serve all students residing in the geocodes assigned to it. The plan's provisions whereby parents may apply for their children's admission to magnet schools and programs do not guarantee such assignments; nor were they meant to support parental attempts to secure fire-safe, structurally sound buildings for their children's schooling. Rather, magnets were to be voluntary preferences for instructional programs. No less than a city-wide district 9 magnet school, a community district school must be one whose building provides a safe, usable and sound environment for all.[3]

During the past decade, parents of both white and black students have rejected assignment to schools with gravely deficient buildings, thus compounding the difficulty of reducing racial identifiability and of ensuring equal opportunity at every school. Many of the buildings located in black residential neighborhoods have experienced low enrollments and even lower proportions of white students who may live within walking distance of the school. One of the purposes of the special measures hereinafter ordered is to prevent less attractive schools from becoming racially segregated.[4] The need for such special measures is even more acute at some schools under the new assignment process in districts 3 and 4 because each school in those districts must compete for students with the other community district schools as well as with magnet and non-public schools.

Facility renovations and improvements central to a desegregation remedy must of necessity be of many kinds because any

---

**2.** The court's general authority to require the expenditure of funds to implement a desegregation remedy is well established. See, e.g., *Arthur v. Nyquist,* (2 Cir.1983) 712 F.2d 809, 813.

**3.** Unfortunately, due to the neglect of the school system's buildings, current long-range facilities planning is a matter of preventing the condition of school buildings from interfering with a school's educational environment and thereby removing obstacles to desegregation, rather than adding attractive features to buildings which may enhance a school's educational and desegregative effectiveness.

**4.** Periodic reassignment of geocodes, another possible special measure, does not address the root of the problem, which is the history of undesirability of certain schools, partly because of deficiencies in their facilities.

one physical condition in a school building may affect all others. For example, broken gutters and roof flashings may result in the destruction of whole classrooms, corridors or libraries. Generally, the improvements hereinafter ordered are of three types: those which safeguard the health and safety of students and staff, e.g., fire alarm systems and sanitary plumbing; those which make routine, daily occupation of the facility possible, e.g., heating and ventilation systems; and those which enable the building to carry out educational programs assigned to it, e.g., lighting adequate to read by in all buildings and an appropriate electrical supply where a school has a computer education program. In sum, the court's proper concern is with attaining a minimum or floor of safety, utility and program operability below which the facility is clearly substandard.

In entering the orders that follow, as well as those for the preparation and filing of a UFP, the court has endeavored to observe the principles enunciated by the Court of Appeals in upholding previous orders of the court regarding renovations necessary to preserve desegregation at South Boston High School. See *Morgan v. McDonough*, (1 Cir.1977) 548 F.2d 28, 29–30. No renovations are herein ordered beyond those recommended by the joint planners, including appropriate officials of the Boston School Department. Planning has proceeded and implementation will proceed with the active participation of many officials of the School Department. No party has argued that any of the items ordered are *per se* unnecessary or excessive. Also, the orders that follow require no appropriations beyond those that the city defendants have agreed to arrange. They come within the financial limitations imposed by the joint planners, ordering only that certain renovations be accomplished sooner than planned in the UFP and others be correspondingly deferred, i.e., that priorities of some projects be shifted for purposes of desegregation.

5. Many orders previous to the 1977 UFP order dealt with the use, disuse, renovation and con-

## II.

The court's search for a long-range plan dates back prior to 1977, when the first Unified Facilities Plan ("UFP") was ordered.[5] A brief history of the court's futile attempts to obtain one is relevant to the course now taken. The current structure of the UFP planning process was first suggested by the joint defendants themselves. By an order dated May 3, 1976, the court had required specific repair programs and new construction projects to begin during the summer of 1976. The court had ordered that the city and state defendants appropriate the necessary funds for the projects and the joint planners were directed to undertake long-range planning for future construction. The defendants appealed these construction and renovation orders, which were then stayed by the court pending the appeal and the possible development of a consensus among the parties through negotiations.

Negotiations took place throughout the summer and fall of 1976 and agreement was reached. On November 15, 1976 counsel for the City of Boston filed a Memorandum of Stipulations, which represented the position of the city and state defendants and the plaintiffs. The school committee, on the recommendation of Superintendent Fahey, approved the stipulations by vote on December 1, 1976. The stipulations were modified by the parties on December 6, 1976 to extend the completion dates of various projects. The *stipulations* as modified stated, in part, that:

(3) The mayoral and state defendants, in consultation with the superintendent, will devise a long-range construction, renovation, and school closing plan for the Boston Public Schools to be presented to the court for approval as consistent with desegregation purposes and the Fourteenth Amendment. The plan will indicate priority among projects and expected completion dates.

\* \* \* \* \* \*

struction of various facilities.

The superintendent and the Boston School Committee will also file by [May 16, 1977] a report explaining the expected impact on desegregation in the system of the facilities referred to in the long-range plan.

\*   \*   \*   \*   \*   \*

(5) The Superintendent and chief structural engineer, in consultation with the mayoral defendants, will devise a long-range maintenance, alteration and repair plan explaining how the alterations and repair budget for the Boston public schools shall be used. The plan shall contain completion dates. Alteration and repair plans will be coordinated with the development of the long-range construction, renovation and school closing plan for the Boston public schools.

Building on the stipulations, the court ordered on May 6, 1977 that the long-range unified facilities plan ("UFP") be filed by September 1, 1977 and further ordered that,

(2) The UFP shall include a schedule for closings, construction and renovation, replacements, as well as repair and refurbishing for all facilities in all nine school districts, for the years 1977 through 1986.

(3) In conformity with state law, the mayoral defendant shall have primary responsibility for parts of the UFP dealing with new construction and renovation; similarly, the chief structural engineer and, through him, the school committee shall have primary responsibility for parts of the UFP dealing with alteration and repair of existing school buildings.

(4) The initial filing of the UFP shall include an analysis of the anticipated impact of the UFP on desegregation and equal educational opportunity in the Boston public schools.

The appeals from the May 3, 1976 orders were withdrawn by the parties on the basis of the court's vacating the provisions directing completion of the specific repair and construction projects and relying instead on the joint planning process.[6]

Discussions commenced, but the joint planners were unable to agree on a unified plan. After several requests for extensions of time were granted without a plan being agreed upon, the court ordered that Superintendent Fahey file the plan as it then existed, regardless of the lack of approval by the school committee. The plan was eventually filed on November 25, 1977 but never acted upon because not "unified". The joint planners continued their attempt to reach agreement and complete the UFP, without result.

The next significant filing was the UFP Manual for District Planning Activities (the "Manual") dated April 23, 1979, which was prepared by school defendant staff members under the direction of Dr. James Breeden, then Senior Officer of Planning and Policy for the school department. The Manual was not a UFP, nor submitted as one, but rather a comprehensive blueprint for preparing one. On August 15, 1979 the court entered another order that the joint planners submit a UFP, this time by December 1, 1979. The court ruled that the format and logic of the Manual were consistent with the remedial aims of the case and stated that the Manual "provides a basis for producing an outstanding UFP which will merit the support of all interested parties."

The "draft UFP" eventually submitted by the joint planners on December 3, 1979 fell far short of the expectations raised by the Manual. The joint planners had still not reached agreement on important issues. This UFP consisted largely of a process to close and consolidate schools in

---

**6.** The specific projects that had been ordered on May 3, 1976 and were vacated on May 6, 1977 were the setting of a deadline for the reopening of Roslindale High School, the phaseout of Dearborn Middle School, the construction of a gymnasium and a cafeteria for Champlain and Holmes middle schools, repairs and renovations at Hyde Park and Dorchester high schools and Barnes Middle School, a schedule for renovating Roslindale High, and the long-range construction of school facilities.

accordance with "beacon" and "linkages" plans [7] and did not provide long-range planning for expenditures or space utilization. After numerous hearings and supplemental filings, the court rejected the draft by memorandum of decision dated April 2, 1980 and ordered the joint planners to resume their discussions consistent with their stipulations and the court's order of May 6, 1977.

On March 13, 1981 the joint planners filed another purported UFP. But this one was simply an interim plan for school closings and consolidations for the 1981–82 school year necessitated by the city's fiscal crisis. The long-range planning was entirely inadequate and the plan was treated by the court as a partial UFP only.

Thereafter facilities planning became part of negotiations among the parties, sponsored by the State Board, designed to arrive at a consent decree which would terminate this litigation. When negotiations failed to produce agreement, the court issued its first orders of disengagement on December 23, 1982, dividing its prior orders into twelve subdivisions and assigning broad monitoring and mediation responsibilities to the State Board, which filed semi-annual reports as to the school defendants' degree of compliance. The renewal of UFP planning, in the spring of 1984 under the auspices of Mayor Flynn, was reported as follows in the July 15, 1984 State Board report (pp. 100–101):

Since the last report, representatives of the Boston Public Schools, City of Boston Public Facilities Department, and representatives of the State Board of Education have met twice to begin to develop a long-range facilities plan on which individual school construction, renovation, or improvement projects may be based. Volume II of this report contains summa-

ries and reports related to those meetings.

The first of the two meetings occurred on April 24, 1984, and was convened by a representative of the Mayor's Office. At this meeting a proposed outline for the contents of the facilities plan was discussed.

On May 3, 1984, a second meeting was held during which representatives of the Boston Public Schools and the Public Facilities Department advised the monitors that the Boston School Committee had voted approval of a list of schools to be retained in the system on a long-range basis, some of which would be the subject of enlargement, renovation, or improvement projects. A list of proposed projects keyed to the schools identified in the list, together with cost estimates, is to be submitted to the State Board.

On September 17, 1984 the court issued a Memorandum and Supplementary Disengagement Orders, stating (p. 4),

Throughout these proceedings and since at least the court order of May 6, 1977, the school defendants have ducked their responsibility to join with the state and mayoral defendants in developing and filing a unified facilities plan.

On November 2, 1984 and January 4, 1985, the court entered further orders setting and then extending a deadline for filing a UFP. Eventually it was filed on March 25, 1985.

### III.

The 1985 UFP, 202 pages in length, is a vast improvement over its predecessors: it contains a brief description of each school, an analysis of capacities and projected enrollments,[8] an analysis of the major facility needs of each school, a statement regarding school closings, a list of projects to be

---

7. These plans were in large part reruns of school department proposals that had been rejected by the panel of four court-appointed masters five years earlier, when the masters were drafting the "phase two" student desegregation

plan adopted and promulgated by the court in May, 1975.

8. These capacity and enrollment figures, while acknowledged by the court, are neither ap-

completed in the next three fiscal years,[9] a process for identifying projects for future years, a mechanism for employing that process, and an appended statement of its desegregative impact. Plaintiffs and plaintiff intervenors, however, filed objections and its numerous deficiencies led the court to state at the hearing that the planners should go back to the drawing board. On further consideration, the court now approves the 1985 UFP and adopts it as a final order; on the basis, however, of curative modifications which can be understood only after a description of the shortcomings of the UFP as filed.

The principal failure of the 1985 UFP as filed is that it does not even purport to be desegregative. It lists modernization projects for virtually every school in the system no differently, so far as appears, than if this lawsuit had never been brought and a decade of court orders never issued. Renovation expenditures are distributed relatively evenly across the city, as if to avoid making the difficult choices that desegregative planning necessarily entails. At literally dozens of hearings, the court explained the relationship between long-range facilities planning and school desegregation. It was not ordering a system-wide laundry list of needed capital improvements, but rather a plan that was remedial, that is, that sought to remedy the wrongs of racial isolation and discrimination previously imposed upon the black plaintiff class. Granted, the last section of the UFP, as if in a postscript, contains the mandated "analysis of the anticipated impact of the UFP on desegregation", subscribed, incidentally, not by the joint planners but individually by Senior Officer John R. Coakley. The court has a high regard for Mr. Coakley's expertise, and, indeed, is indebted to him for his conscientious implementation of orders regarding student assignments; but his submission in section V does not discuss whether the UFP, if accomplished, will increase or decrease the racial identifiability of schools or the racial/ethnic isolation of students or their unequal treatment due to the age and condition of buildings relative to one another. Section V reaches the defensive conclusion that the UFP will not affect desegregative adversely. But, like the operative parts of the plan, it barely acknowledges the "wide disparity of facilities—and [the] need—to reduce existing differences" described by Superintendent Wood. A desegregative facilities plan in a school system like Boston's is one which uses building locations, conversions, renovations and, yes, closings affirmatively to safeguard and foster the gains made each year in eliminating racial isolation. Regrettably the joint planners, so far as appears, did not even try to develop that type of plan.

Also, the 1985 UFP as filed is not the "long-range plan" promised by the joint planners, but rather a three-year plan with long-range possibilities. It proposes one new construction and various renovations during the first three years. For years four and thereafter it proposes no new construction and what the witnesses at the hearing described as a "menu" from which future projects may be selected. The UFP states (p. III C–10):

> The Joint Planners have agreed that as professional planners they cannot and should not designate projects for years 4–10 at this time. The evolving needs of a large urban school system like Boston's make such long range projections inher-

proved nor rejected, being properly subject to ongoing refinement by the joint planners.

9. By order issued on May 9, 1985, at the request of the school defendants, the court approved the renovation projects scheduled for the current fiscal year because any substantial delay in initiating them would result in at least some of the projects being unfinished by the opening of school in the fall of 1985. These projects include the modernization of the heating systems at Hyde Park (IC–13), Burke (IC–7) and Boston Technical (IC–5) high schools, Dearborn (IC–24), Gavin (IC–27), Wheatley (IC–41) and Lewenberg (IC–31) middle schools and Haley (IC–124) elementary school; and new roofs at Madison Park High (IC–15) and Hennigan (IC–125) elementary. The estimated total cost of these projects is $4,290,000. To help understand the pagination of the UFP, its Table of Contents and number of pages in each section is appended hereto as Appendix "A".

ently unreliable. They have, therefore, agreed upon a process for identifying projects to be undertaken in those years. But this agreement disregards the court's orders. Furthermore, it is inconsistent with the planning practices of large organizations of every type, including public school systems, throughout the country. Failure to plan ahead makes projects for each year after the first three subject to postponement, political lobbying and uncertain funding and undercuts the very stability that long-range planning is designed to promote.

Finally, contrary to the parties' explicit stipulations and the court's repeated orders, the UFP is silent on the subject of alterations and repairs. At the hearing on April 25, 1985 one of the witnesses stated that the UFP was limited to capital expenditures because they are the only ones for which joint planning is needed, inasmuch as the state does not fund ordinary repairs. The State Board has sought to repair this egregious default and to force the subject into the joint planning process by conditioning its approval of the entire UFP on the city and school defendants' increasing permanently the annual maintenance budget from $6 million to $8 million dollars. Briefs filed by the city and school defendants have sought to pass the buck on this issue. The court accepts the statement in the state defendants' brief, "There appears to be general agreement that the current $6 million dollar figure is woefully inadequate."

As for what the UFP contains rather than what it lacks, plaintiffs object strenuously to the UFP's allocating over half the total planned expenditures of every nature to the two Latin schools, Latin School (formerly Boys' Latin) and Latin Academy (formerly Girls' Latin). The apparent reason is that in the fall of 1983, in the waning days of Mayor White's administration, the mayor proposed and the city council approved a $35,000,000 bond issue for construction of a new Latin Academy and complete renovation of Latin School. The State Board accurately labeled the authorization as "a

commitment without a project." Now, two years later, neither project is scheduled in the UFP. These potential projects are still in the planning stage, with formidable hurdles to overcome. One of them is approval by the State Board, whose current comment is as follows:

At such time as specific projects are presented, the State Board intends to analyze the proposals in terms of both their impact on desegregation and the overall secondary education program in Boston. The desegregation analysis is essential to determine whether the two Latin Schools, which enroll a disproportionate number of white students, are eligible for 90% state reimbursement; the educational analysis is essential in determining whether these projects are eligible for state reimbursement in the first instance.

Another requirement with respect to a new Latin Academy is court approval under the terms of the permanent injunction dated June 5, 1975. Obvious questions include whether, at a fraction of the proposed cost, Latin Academy could be housed in a portion of one or another of the system's several large senior high school facilities, several of them quite new and superbly equipped, in a time when, according to the enrollment projections included in the UFP itself, senior high school enrollments are expected to decline from 16,079 in April 1985 to 13,493 in April 1990. The countervailing consideration, in the opinion of Mr. Coakley, is the maintenance of distinctive programs at the other high school facilities. Is that consideration more important, from a desegregative point of view, than renovation of scores of dilapidated elementary schools? Alternatively, for a new Latin Academy, can the city perhaps acquire a building already constructed and convert it into a modern high school, as was done when Jamaica Plain High was relocated in the former Boston Gas Company plant? The plaintiffs and other parties do not challenge the desirability of possible future expenditures on the Latin Schools so much as their being used as an excuse for postponing, until fiscal 1989 and beyond, reno-

vations urgently needed now at many other schools. They ask, in effect, is the 1985 UFP a genuine response to ex-Superintendent Spillane's complaint, "The disgraceful physical condition of our school buildings can no longer be tolerated"?

Another troublesome, if reasonably necessary, feature of the 1985 UFP is the highly contingent nature of the city's asserted commitment, as follows:

All fiscal requirements and commitments in this UFP are subject to the following conditions:

For each facility project to be undertaken

... the City of Boston must receive a level of reimbursement from the State Board of Education in accordance with state law which permits the City of Boston in its fiscal judgment to proceed with the proposed project.

... the city's bond rating must permit it to prudently borrow the funds needed to finance each such project.

... the city's fiscal condition must permit it to undertake each such project.

... the City of Boston must be able to obtain the necessary loan orders and appropriations for each such project.

The single controlling criterion in developing the UFP was the city defendants' arbitrary insistence that an annual ceiling of approximately $4,000,000 be imposed on major alterations during the first three years. The nature of these alterations is noteworthy. Almost all of them are for energy-related improvements such as rebuilding roofs and modernizing heating plants. Until 1983, when the state statute was amended, see Mass.G.L., appendix to c. 70, roof and furnace work was not eligible for reimbursement by the state. During the previous decade, according to the testimony of Associate Commissioner David A. Jones, Boston made no roof or furnace repairs except on an emergency basis. The court's 1977 orders for a UFP intended that the city and school defendants propose the types of projects that would be reimbursable under the law as it stood in 1977. Thus the 1985 UFP as filed has defeated

the court's intention in this regard by virtually restricting proposals for the first three years to projects in the nature of deferred maintenance.

Moreover, the cost to the City of Boston of its conditional commitment is considerably less than the large dollar amounts appearing throughout the plan. Under the state aid formula for financing projects, each of which must be certified after review as a furtherance of desegregation, the state will reimburse the city for 90% of both the principal expenditure and interest paid by the city on bonds issued to obtain the necessary funds.

The State Board's commitment to the UFP is also conditional, but in a different sense than the city's which specified four conditions precedent to its undertaking any facility projects. The strings attached by the State Board are in the nature of conditions subsequent, i.e., that it has given its approval with the understanding, presumably that of the other joint planners, that certain conditions are to be met in the future. Three such conditions were incorporated in the State Board's vote approving the UFP, as follows: "that the maintenance budget of the Boston School Committee, currently funded at $6 million, will be permanently increased to $8 million; that there be a study of the long-term annual maintenance needs of the Boston Public Schools; that responsible Boston officials develop and implement a schedule of incremental appropriations to meet the maintenance needs identified in said study...."

The language of the vote does not name the parties with whom the Board reached its understanding, but its comments filed with the court on May 3, 1985 are clarifying, viz., "The $8 million figure is a product of negotiations among the Joint Planners, and represents an offer by School Defendants to increase the current appropriation by a transfer of funds from the separate budget appropriated for general school purposes." In their supplementary memorandum, also dated May 3, 1985, the school defendants urge the court to order the city defendants to approve a permanent $2 mil-

lion increase in the alterations and repair budget. By memorandum filed on May 8, 1985 the city defendants object to any such order. The court will not intervene in this dispute because it could make a reasoned decision only on the basis of thorough and independent professional analysis and opinion. The court is simply in no position to rule upon the adequacy of the proposed $8 million annual level of funding for alterations and repairs, or for that matter, any other annual level. Also, a permanent increase in the maintenance budget would probably require the approval of the Boston City Council, whose members are not parties to this case.

However, on the basis of the record of these proceedings, the court does hereinafter order fulfillment by the city and school defendants of the second and third conditions attached to the State Board's approval of the UFP. These conditions, requiring a study of maintenance needs and a timetable for meeting them, call for little more than the parties' stipulations filed nearly nine years ago, whereby the school defendants agreed to consult with the mayoral defendants and to devise "a long-range maintenance, alteration and repair plan explaining how the alterations and repair budget for the Boston public schols shall be used. The plan shall contain completion dates."

Finally, it is unclear from the State Board's vote and subsequent filings in these proceedings whether, should the specified conditions not be fulfilled, the Board intends to withhold the 90% funding participation to which it is otherwise committed.

## IV.

Under all the circumstances, then, how can the court support its approval of the UFP and its adoption as an order of the court? The easy if subordinate answer, requiring scant elaboration, is that a bird in the hand is worth two in the bush. Having sought a UFP for nearly a decade, it would seem unwise at this juncture to embark on a new search. Also, the court places reliance upon the opinions received from Senior Officer Coakley in Section V of the UFP and Dr. Charles Glenn, Director of the State Bureau of Equal Educational Opportunity, who testified at the hearing that the UFP as filed would facilitate racial desegregation. In the main, however, the court's approval and adoption rest upon its ordering changes in some of the priorities included in the UFP so as to make it genuinely affirmative in reducing racial isolation and identifiability. The orders which follow do not affect the priorities of proposed major alterations for the first year, fiscal 1986, which are currently in progress. However, for the second and third years, the orders identify three and six schools respectively whose desegregative needs have the greatest vulnerability or longest periods of neglect, and require that projects scheduled for them in subsequent years be advanced and undertaken in fiscal 1987 or 1988. Toward facilitating compliance with these orders, the court also enjoins the State Board from withholding its funding for those nine projects on the basis of the conditions stated in its March 20, 1985 vote of approval.

The common characteristic of the nine schools needing expedited renovations for purposes of racial desegregation is that they are all community district schools and so-called special desegregation schools, i.e., designated in orders entered May 3, 1976, May 6, 1977, or March 21, 1978 as requiring special measures to enable them to attract and hold enrollments meeting the student assignment guidelines.[10] The history of the measures undertaken at Burke High (IC–7) is slightly different, in that on November 6, 1981 the court issued a draft order for special remedial measures at Burke (IC–7), to which the school defendants responded by filings on January 27 and February 8, 1982 with voluntary special measure plans, including specific facilities improvements. Unique special measures were ordered at South Boston High

---

**10.** In all, twenty schools were so designated at one time or other. See State Board Report No. 4, July 15, 1984, Vol. II, pp. 73–74 for a complete listing.

School (IC–17) in the form of a temporary receivership, which ended by a consent decree approved by the court on November 16, 1978. The various court orders in this subdivision of the proceedings are summarized at pages 233–250 of Volume II of the State Board Monitoring Report dated July 15, 1983.[11] The purpose of the several orders for special measures was the achievement of effective desegregation in schools which remained identifiably black or otherwise in special need; and the details of the measures undertaken, e.g., student recruitment, innovative programs, capital improvements, etc. are described at length in the five State Board monitoring reports.

Most of the changes in priorities herein ordered are not sharp departures from the UFP as filed. Of the nine schools selected, seven are designated in the UFP as recipients of major alterations during the first three years of the plan. For example, Lee Elementary (IC–66) in District 3 is scheduled in the UFP as filed to receive roofing repairs at an estimated cost of $235,000 in year 3, and as needing total alterations costing $310,000. By ordering all of the alterations to be accomplished in year 3, the net effect of the court's order is to require advanced priority of repairs costing $75,000. For another example, the UFP as filed schedules new roofing for Tobin School (IC–50) in District 1 for year 2 at an estimated cost of $80,000, of a total capital improvements needed at the building of $165,000; and hence the effect of the court's order now is to advance the time for the other improvements costing $85,-000. The total dollar amount of changes in priorities herein ordered is $4,064,000 out of a UFP total scheduled for the first 3 years of $12,768,000. UFP priorities to projects costing an estimated $8,704,000 remain unchanged.

The need at Burke High (IC–7) is discussed in every one of the State Board monitoring reports; and cosmetic repairs such as new windows, painting, and work in the gymnasium and auditorium have been accomplished. A new heating system is currently being installed at Burke at an estimated cost of $650,000. However, additional work essential to make the building fairly habitable is desperately needed, e.g., masonry, plumbing and electrical work. The court finds that desegregation of Community District 5[12] and of Burke High requires that these structural repairs be accomplished in year 2, i.e., fiscal year 1987.

The desegregation problems at South Boston High School (IC–17), by far the oldest high school building in the city, having been built in 1901, are quite different than they were ten years ago. In September 1985 it will enroll over 1,000 students, the seventh largest number in the school system. Under the inspiring leadership of Headmaster Jerome C. Winegar, the school has consistently attracted a desegregated student body and provided an increasingly effective education for its pupils. But a new dark cloud has appeared on its horizon, namely, the danger of its loss of accreditation because substandard building conditions threaten the health and safety of

---

11. Pursuant to the court's initial orders of disengagement entered on December 23, 1982, the State Board filed five semi-annual monitoring reports, each in two or three volumes totaling 600–800 pages and containing separate monitoring reports on each of twelve subdivisions of court orders entered in the case. The first report was dated July 15, 1983 and the fifth, July 15, 1985. Two of the subdivisions were entitled "Special Desegregation Measures" and "Facilities" and furnish an indispensable background to an understanding of the instant memorandum and orders.

12. The court's finding with respect to needs of District 5 as well as those of Burke High (IC–7) is predicated in part on a memorandum prepared by court expert Dr. Robert A. Dentler dated January 16, 1985, which was distributed to the parties on January 18, 1985. It describes a jeopardy shared by students in Districts 4 and 5. Relevant excerpts are set forth in Appendix B. Incidentally, two of the nine designated special measures schools, Thompson Middle and P. Shaw Elementary, are located in Community District 4.

its pupils. In 1981 the New England Association of Schools and Colleges (NEASC) made recommendations for improvements in the facility which would be required before the school would receive accreditation. Again in December 1983 NEASC reiterated its concerns and noted the lack of progress made in improving conditions affecting cleanliness and safety. Not until after parents communicated with Rita Walsh-Tomasini, then president of the school committee, were they able to obtain paint from the school department and ladders and brushes from the city in order to do desperately needed painting themselves. Reaccreditation of South Boston High School is still in doubt.[13]

South Boston High School has come to symbolize the desegregation of the Boston public schools. The consent decree terminating its temporary receivership provided that "renovation ... shall be implemented by the school committee" and "the chief plant engineer shall take all reasonable steps to maintain an environment which is clean and conducive to learning." The UFP appraises the capital improvements needed there at an estimated cost of $1,405,000 and scheduled installation of a new heating system for year 2 at a cost of $650,000 and new windows in year 3 for a cost of $240,000. The orders that follow provide that improvements scheduled in the UFP for year 4 and beyond at an estimated cost of $515,000 be advanced and that the entire project, for purposes of both desegregation and accreditation, be accomplished in year 2, fiscal 1987.

On identical findings of special need for desegregation, the court orders the advancement of projects to year 3, fiscal 1988, and revising of priorities with respect to the other two middle and four elementary special measures schools specified in the

orders that follow: R. Shaw (IC–37) and Thompson (IC–39) middle and Ellis (IC–54), Emerson (IC–98), Lee (IC–66) and P. Shaw (IC–78) elementary.

In deciding which projects must be deferred to year 4 and beyond in order to comply with the priorities herein ordered, assuming that the arbitrary ceiling on capital expenditures for years 2 and 3 remains in effect, the joint planners will presumably decide upon projects whose postponement will have the least adverse impact on racial desegregation.

## UFP ORDERS

After hearing and consideration of the arguments and briefs filed by the parties regarding the Unified Facilities Plan (UFP) filed on March 25, 1985, it is ORDERED as follows on the basis of the findings and conclusions stated in the memorandum of decision filed contemporaneously herewith:

1. The UFP filed on March 25, 1985 is approved and adopted by the court on conditions (a)–(e) stated in the introduction and with the qualifications hereinafter ordered, and the joint planners shall take all steps reasonably necessary to carry it out.

2. (a) During fiscal year 1987 the major facility needs at the following three schools, as described in section IC, pages 7, 17 and 50, shall be given priority and the joint planners shall not in that year begin work on other major renovation projects until after they have committed funding and begun work on the projects for Burke High, South Boston High and Tobin school.

(b) During fiscal year 1988 the major facility needs at the following six schools, as described in section IC, pages 37, 39, 54, 66, 78 and 98, shall be given priority and the joint planners shall not in that year begin work on other major renovation

---

**13.** Additional repairs done at South Boston High during July and August have not eliminated the threat of loss of accreditation, although they did accomplish two of the alterations required by NEASC, viz., adding a lavatory to the nurse's room and some partitions in the guid-

ance counseling offices. The school department also replaced floors in six classrooms and staff members volunteered the work to replace the floors in two other rooms. Interior painting of the building was also completed professionally.

projects until after they have committed funding and begun work on the projects for R. Shaw Middle, Thompson Middle, and Ellis, Emerson, Lee and P. Shaw schools.

3. With respect to the nine renovation projects identified in the previous paragraph, the State Board shall not invoke any of the conditions stated in its vote approving the UFP taken on March 20, 1985.

4. (a) Provisions in the UFP regarding Latin School and Latin Academy projects are not approved and the injunction dated June 5, 1975 requiring court approval of new construction projects shall continue in force and effect with respect to proposed Latin School and Latin Academy projects, as to which the court specifically retains jurisdiction; but except as to projects for those two schools, the 1975 injunction is

vacated and court approval of new construction projects shall no longer be required.

(b) The process for identifying projects, as described in section IIIC, pages 10 and 11, shall include a review and reassessment of proposed projects for Latin School and Latin Academy.

5. The school defendants and city defendants shall comply with the second and third conditions contained in the State Board's vote of March 20, 1985, viz., "that there be a study of the long-term annual maintenance needs of the Boston Public Schools; that responsible Boston officials develop and implement a schedule of incremental appropriations to meet the maintenance needs identified in said study"; and said study shall begin immediately.

## APPENDIX A

### TABLE OF CONTENTS

|  |  | Number of Pages |
| --- | --- | --- |
| Introduction |  | (3) |
| I. | Schools to be Retained in Service |  |
| IA | Schedule of Schools and Facilities, Capacities, Construction Dates and Grade Range | (10) |
| IB | An Analysis of Capacities and Projected Enrollment by District and by Grade Level | (27) |

    1. Elementary Schools
    2. Middle Schools
    3. High Schools
    4. Summary of All Schools
    5. Five Year Enrollment Estimates
    6. Ten Year Enrollment Estimates
    7. District Estimates

| IC | Analysis of Need by School | (134) |
| --- | --- | --- |
| II. | Statement of Schools to be Closed | (2) |
| III. | Projects in Unified Facilities Plan |  |
| A. | Introduction | (2) |
| B. | Years One to Three | (7) |
| C. | Years Four to Ten | (11) |
| IV. | Mechanism for Ensuring that the UFP Addresses Priority Needs of School System | (1) |
| V. | Desegregative Impact | (5) |

## Appendix B

*Excerpts from Dr. Robert A. Dentler's Memorandum dated January 16, 1985*

1. The purpose of this memorandum is to identify and suggest some solutions for a central problem which threatens the future of desegregation for a large segment of Boston public school students and therefore threatens the protection of their rights. The rights to be protected are racial unitariness in policies and operations; the prevention of racial isolation; elimination of racially identifiable schools; and equal educational opportunity.

2. Documents such as the December 6, 1984 enrollment printout and other records support strongly the inference that these rights are in greatest jeopardy in two of the nine school districts. The main points concerning Hyde Park Community District 4 and Dorchester Community District 5 may be summarized as follows:

a. 37% of all black students resided there in 1975 and 50% reside there now.

b. No other community district houses more than 14% of all enrolled black students and none has changed its share since 1975 by more than 3%.

c. District 4 has five schools and District 5 seven schools that are now composed of from 76% to 83% black students.

d. District 4 hosts no citywide magnet schools and District 5 hosts only the M.L. King Middle School and the tiny 200 seat Hernandez Elementary School.

e. Half of the black students residing in District 5 are enrolled in citywide magnets, or about 1.5 times more than from any other district, yet a significant number of District 5 black students who regularly apply to magnets do not receive assignments to their first preferences.

f. Many of the facilities in these two districts are among the most dilapidated and least well repaired of the system's buildings.

g. The middle schools in these districts, including the M.L. King, have more empty or surplus seats than others—save for the Gavin Middle School in South Boston.

3. In summary, these districts are located along the city's racial frontier. *The Masters' Report* of April 1975 warned of the potential significant impact of this development as did the State Board and plaintiffs in May 1975. The turnover of once all-white neighborhoods into nearly all-black will continue past 1995. The DI has offset the trend somewhat by stressing movement into magnet schools, but no relief of greater pertinence to Dorchester has been suggested or tried. Despite the faults of the so-called "Freedom of Choice Plan," it recognized the problem of the relative isolation of Dorchester's and Hyde Park's black students and attempted to address it.