Tallulah MORGAN, et al.,
Plaintiffs, Appellees,

v.

John A. NUCCI, et al.,
Defendants, Appellants.

Tallulah MORGAN, et al.,
Plaintiffs, Appellees,

v.

John A. NUCCI, et al., Defendants,
Appellees.   (Two Cases)

Appeal of BOSTON TEACHERS
UNION, LOCAL 66, AFT,
AFL–CIO.

Appeal of MAYOR OF BOSTON and
Public Facilities Commission of the
City of Boston, Defendants.

Nos. 85–1447, 85–1900, 85–1747
and 85–2006.

United States Court of Appeals,
First Circuit.

Argued March 5, 1987.

Decided Sept. 28, 1987.

Henry C. Dinger with whom Marshall Simonds, P.C., Nancer Ballard and Goodwin, Procter & Hoar, Boston, Mass., were on brief for appellants Joseph Nucci and School Committee of City of Boston in Nos. 85–1447 and 85–1900.

Thomas I. Atkins, Baltimore, Md., with whom Robert Pressman, Center for Law & Education, Washington, D.C., was on brief for plaintiffs-appellees Tallulah Morgan, et al., in Nos. 85–1447 and 85–1900.

Joan Entmacher, Asst. Atty. Gen., Civ. Rights Div., with whom Francis X. Bellotti,

Atty. Gen., Boston, Mass., and Robert H. Blumenthal, Counsel, Dept. of Educ., Quincy, Mass., were on brief for appellee State Bd. of Educ. in Nos. 85–1447 and 85–1900.

Steven P. Perlmutter with whom Harrison & Maguire, P.C., Boston, Mass., was on brief for appellants Mayor of the City of Boston and Public Facilities Com'n of the City of Boston in No. 85–2006.

Henry C. Dinger with whom Marshall Simonds, P.C., Nancer Ballard and Goodwin, Procter & Hoar, Boston, Mass., were on brief for defendants-appellees School Committee of the City of Boston and Superintendent of the Boston Public Schools in No. 85–2006.

Robert Blumenthal, Quincy, Mass., for appellee State Bd. of Educ. in No. 85–2006.

Carolyn B. Playter, Nat. Lawyers Guild, with whom Kehoe, Doyle, Playter & Novick, Boston, Mass., and Kenneth Kimerling, Puerto Rican Legal Defense Fund, New York City, were on brief for plaintiff-intervenor, appellee El Comite de Padres in No. 85–2006.

Robert Pressman, Center for Law & Educ., Quincy, Mass., for plaintiffs-appellees Tallulah Morgan, et al., in No. 85–2006.

James T. Grady with whom Gabriel O. Dumont, Jr. and Grady, Dumont & Dwyer, Boston, Mass., were on brief for appellant Boston Teachers Union, Local 66, in No. 85–1747.

Henry C. Dinger, Boston, Mass., for appellees John A. Nucci and School Committee of the City of Boston in No. 85–1747.

Carolyn B. Playter, Boston, Mass., for plaintiff-intervenor, appellee El Comite de Padres in No. 85–1747.

Robert Pressman, Quincy, Mass., for plaintiffs-appellees Tallulah Morgan, et al., in No. 85–1747.

Robert Blumenthal for appellee State Board of Educ. in No. 85–1747.

Nancy Gertner and Silverglate, Gertner, Fine, Good & Mizner, Boston, Mass., on brief for plaintiff-intervenor, appellees Concerned Black Educators of Boston in No. 85–1747.

Before CAMPBELL, Chief Judge, COFFIN and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

These consolidated appeals from orders entered by the district court in the Boston public school desegregation case raise questions as to whether the federal court may properly continue to involve itself in certain school matters. At issue is whether desegregation has been so far accomplished that the orders amount to an improper perpetuation of the district court's powers.

## I. BACKGROUND

The history of the Boston school desegregation case is set out in our previous decisions. *See, e.g., Morgan v. O'Bryant,* 671 F.2d 23 (1st Cir.1982); *Morgan v. Kerrigan,* 530 F.2d 401 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976); *Morgan v. Kerrigan,* 509 F.2d 580 (1st Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). We recount only so much as most directly bears on the instant appeals.

When the plaintiffs first brought this suit in 1972, the district court found that the Boston public schools, administered by the Boston School Committee, were suffering from widespread racial segregation created, to an important extent, by the purposeful misconduct of public officials. Intentional segregation existed in the process by which students were assigned to the schools, but it did not stop there. *Morgan v. Hennigan,* 379 F.Supp. 410 (D.Mass. 1974). The court identified many other areas where discriminatory practices occurred, such as in the hiring and placement of teachers and staff and in the locating and upkeep of school buildings. *Id.* at 425–66. This court affirmed these findings by the district court. *Morgan v. Kerrigan,* 509 F.2d 580 (1st Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

In 1975, the district court began issuing orders to rectify the unconstitutional condi-

tions. The most ambitious, and the most controversial, aspect of the court's remedial plan centered on student assignments. The court divided the city into eight geographical community districts and one city-wide "magnet" district. *Morgan v. Kerrigan*, 401 F.Supp. 216, 256–57 (D.Mass. 1975). It required that assignments to schools within any one of the community districts be such as would ensure that the percentage of black, white, and "other minority" students approximate the corresponding percentage of each group in that district's total student population. *Id.* at 261. Assignments to the magnet schools had to approximate the racial composition of the student population of the entire city. *Id.* at 262. We affirmed these orders on appeal. *Morgan v. Kerrigan*, 530 F.2d 401 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976).

At about this time, the district court also issued orders relating to, among other things, faculty and staff, *Morgan v. Kerrigan*, 388 F.Supp. 581 (D.Mass.1975), *aff'd*, 530 F.2d 431 (1st Cir.1976); facilities, *see Morgan v. McDonough*, 689 F.2d 265 (1st Cir.1982); special education, school safety and security, student discipline, bilingual education, vocational education, and student transportation, *see Morgan v. Nucci*, 620 F.Supp. 214, 218 (D.Mass.1985). The broad scope of the court's remedial program was necessary to transform the Boston schools into "a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).

A decade after the case was brought, in 1982, the district court found that the Boston schools had made significant progress toward the goal of "unitary status," *i.e.*, a fully integrated, non-segregated system. The court thus commenced what it labelled a "transitional course of [judicial] disengagement." *Morgan v. McDonough*, 554 F.Supp. 169, 171 (D.Mass.1982). While initially keeping in effect its outstanding desegregation orders, the court established a new administrative mechanism that mark-

edly reduced the need for direct judicial supervision of the schools. Primary responsibility for monitoring defendants' compliance with the court's desegregation orders and for mediating disputes between the parties was transferred to the Massachusetts Board of Education (the "State Board"). *Id.* The court required the State Board to submit to it semi-annual reports documenting "defendants' efforts and activities toward fulfilling their affirmative duty to remedy all vestiges of their [constitutional] violation." *Id.* at 175.

After 1982, the district court also took the further step of terminating permanently roughly half of its original remedial orders in discrete areas of school operations. *See Morgan v. Nucci*, No. 72–911–G (D.Mass. Aug. 8, 1985) (student transportation); *Morgan v. Nucci*, No. 72–911–G (D.Mass. May 17, 1985) (bilingual education, school safety and security, student discipline); *Morgan v. Walsh-Tomasini*, No. 72–911–G (D.Mass. Oct. 31, 1984) (special education, institutional pairing). The court did not, however, eliminate all injunctive orders. In a number of key areas where it felt judicial controls were still needed, it issued what it termed "final orders" setting out binding requirements and standards. These orders pertained to vocational and occupational education, school facilities, student assignments, staff desegregation, and parent and student organizations. *Morgan v. Nucci*, 620 F.Supp. 214, 218 (D.Mass.1985). The court explained that "[w]hile significant progress has been achieved in these areas, the State Board reports show that each entails some unfinished planning, implementation or monitoring." *Id.* The court nonetheless signalled its lessened involvement by formally removing the school case from its "active docket." *Id.* at 219.

The present appeals are taken from two of these so-called final orders, and from a third similar order. Briefly, the appeals are as follows:

1. The school defendants[1] challenge paragraph 3 of the final orders, which re-

---

1. Throughout this opinion, we shall refer to the

Boston School Committee and its president col-

quires the continued observance of specified racial guidelines in assigning students to the city's schools.

2. The Boston Teachers Union appeals from paragraph 5 of the final orders, which requires the school defendants to follow hiring practices that will secure a faculty and staff consisting of not less than 25 percent black and 10 percent other minority personnel. Since the mid–70s, the schools were under orders to reach basically this same goal. As of the date of issuance of the challenged "final" orders, the goal had yet to be fully realized.

3. The city defendants[2] challenge paragraph 5 of the district court's orders relative to the unified facilities plan. These orders were entered the same day as were the "final" orders. *Morgan v. Nucci*, 617 F.Supp. 1316, 1327–28 (D.Mass.1985).

We discuss each of these appeals below. We (1) vacate and remand the student assignment order; (2) sustain the faculty and staff hiring order; and (3) dismiss as moot the appeal from the facilities order.

## II. STUDENT ASSIGNMENTS

We turn first to the school defendants' appeal from the district court's final order imposing requirements concerning the racial mix of students assigned to each of the Boston public schools.

This order[3] prescribes in essence that the racial/ethnic proportions in each school's enrollment must approximate the racial/ethnic proportions of the public school population of either the particular district within which a school is located or of the city as a whole. Under this order, the school defendants will be required for an indefinite period to *maintain* specific racial mixes in the city's schools, much like the balances they have been required to *achieve* during the 12 years in which the district court actively controlled the desegregation process.

Beginning with its first remedial order in 1975, *Morgan v. Kerrigan*, 401 F.Supp. 216 (D.Mass.1975), *aff'd*, 530 F.2d 401 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976), the district court has required students to be assigned to Boston schools according to a master plan that the court devised in order to ensure a proportionate mix of the races in each school.[4] The school defendants protest that an injunction indefinitely perpetuating a particular, judicially drawn formula is altogether inappropriate. They say that by 1985, when the challenged order was entered (and well before), Boston's schools were substantially in compliance with all of the court's remedial assignment orders. At least, they contend, pupil assignments were as much in conformity to the court's desegregation plan as could ever practically be expected. Thus, in appellants' view, the challenged order was in the nature of a perpetual injunction, directing the school

---

lectively as the "school defendants."

**2.** By "city defendants" we mean the Mayor of the City of Boston and the director and commissioners of the Public Facilities Commission of the City of Boston.

**3.** The order requires that the schools

    (a) shall compose enrollments at each school so that its racial/ethnic proportions shall be consistent with current guidelines which shall be derived, with respect to citywide magnet schools and programs, from the citywide public school population and, with respect to district schools, from the public school populations of their current districts or consolidations thereof; ...

    (b) alternatively, may beginning with the 1986–87 school year or thereafter use a single, citywide guideline for assigning students.... *Morgan v. Nucci*, 620 F.Supp. at 215–16. Under either (a) or (b) assignment totals at a particular

school may diverge from the target percentages within a range determined by adding and subtracting 25 percent of the total percentage. Thus, if the target percentage for a particular group is 48 percent, any assignment between 36 and 60 percent (48 plus or minus 12) is acceptable. *See id.* at 221.

The school defendants also appeal—on the same ground—from an unpublished order of May 24, 1985, that requires schools in districts 4 and 5 to reflect the district's racial mix within a variance of ten percent.

**4.** Subparagraph (a) of the present order is very similar in concept, although not in all its specifics, to the student assignment plan drawn up by the district court in 1975. The option contained in subparagraph (b) allowing student assignments to conform to citywide proportions is, however, new.

defendants to carry forward for all time the court's particular scheme for racial balancing even though the schools had achieved unitary status *in the area of school assignments.*

In the memorandum accompanying its orders, the district court stated that the school defendants had yet to implement fully the student assignment aspect of the 1975 desegregation plan. *Morgan v. Nucci,* 620 F.Supp. at 218. While removing the school case from its active docket and "clos[ing] the file," the court thought it proper to put in place an injunction relative to student assignments which the parties could, if need be, enforce in court. The district court explained that

> the final orders seek to provide assignment guidelines *for future years* which are as flexible as consistency with a workable student desegregation plan permits; and an irreducible minimum of safeguards for insuring a future in which the Boston public schools may flourish on a racially unitary, racially unidentifiable yet flexible and clear foundation of equal access and equal educational opportunity for all students.

*Id.* at 222 (emphasis supplied). The court also noted that the orders in Paragraph 3 were based on proposals submitted by the school defendants that were designed, *inter alia,* "to improve the fit between a decade of demographic changes in Boston and the terms of student access to educational opportunities." *Id.* at 220.

■ In considering appellants' objections, we start with the fact that "unitariness" (*i.e.,* complete desegregation) in *all* aspects of the Boston schools has not yet been achieved. For example, as we point out in Part III, *infra,* the school system has yet to attain targeted goals in minority faculty hiring. A threshold question thus arises whether the failure of the Boston system to have reached unitariness in areas other than student assignments (such as in faculty hiring) provides justification for the district court to continue to impose its specific student assignments plan. Under the Supreme Court's decision in *Pasadena City Board of Education v. Spangler,* 427 U.S.

424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), we believe the answer to this question is clearly "no." Our primary inquiry is, therefore, whether unitariness has been reached *in the area of student assignments* itself. As we discuss below, our review of the record suggests to us that the student assignment process is now unitary. But we are reluctant to make such a final determination without allowing the district court a further opportunity to consider the unitariness issue. Accordingly, we vacate the student assignment orders and remand to the district court for proceedings consistent with the standards we announce here.

We now proceed to these matters in detail.

## A. *Unitariness and Termination*

■ The Supreme Court first articulated the concept of unitary status in *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). This status represents the "accomplishment" of desegregation, and is the ultimate goal to which a desegregation court tailors its remedies once a finding of intentional discrimination is made. Although the Court has produced no formula for recognizing a unitary school system, the one thing certain about unitariness is its consequences: the mandatory devolution of power to local authorities. Thus, when a court finds that discrimination has been eliminated "root and branch" from school operations, it must abdicate its supervisory role, in recognition that the "local autonomy of school districts is a vital national tradition." *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 410, 97 S.Ct. 2766, 2770, 53 L.Ed.2d 851 (1977).

Appellee State Board argues that until every facet of the school system has become unitary, the district court's remedial power is virtually unlimited—so broad in fact that the district court may continue to issue orders even in specific areas of school operations where discrimination has ceased and the effects of past discrimination have been eradicated. The Supreme Court's opinion in *Pasadena City Board of Edu-*

*cation v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), however, forecloses this argument. In *Spangler,* the Court found that unitary status had been attained in student assignments, even though not in other facets of the school system's operations. *Id.* 427 U.S. at 436–37, 96 S.Ct. at 2704–05. Thus, the district court had "fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns." *Id.* at 437, 96 S.Ct. at 2705; *see id.* at 438 n. 5, 96 S.Ct. at 2705 n. 5. In short, *Spangler* holds that a student assignment order is justified only by a lack of unitariness in the student assignment process itself.[5]

### B. *Unitariness in Student Assignments*

We turn to the question whether the Boston student assignment process is now unitary. One commentator has called the question of what constitutes unitariness "the central riddle of the law of school desegregation." Fiss, *The Charlotte-Mecklenburg Case—Its Significance for Northern School Desegregation,* 38 U.Chi. L.Rev. 697, 700–01 (1971). Just as the remedial apparatus necessary to eliminate discrimination will depend on the individual circumstances of a school system, *see Green,* 391 U.S. at 439, 88 S.Ct. at 1694, so too will the determination whether desegregation has been achieved in a particular case.

The case law suggests that three general inquiries are relevant to whether the Boston schools have achieved unitariness in student assignments: (1) the number of one-race or racially identifiable schools; (2) whether school defendants have demonstrated good faith in the desegregation effort and the running of the schools; and (3) whether maximum practicable desegregation of student bodies at the various schools has been attained. We shall discuss each of these in light of the present record.

(1) One-Race or Racially Identifiable Schools

Courts have long recognized that an abundance of one-race or racially identifiable schools within a school district may preclude a finding of unitariness.[6] The Supreme Court has made clear, however, that "some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law." *Swann v. Board of Education,* 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). *Accord Riddick v. School Board,* 784 F.2d 521, 535 (4th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986); *Davis v. East Baton Rouge Parish School Board,* 721 F.2d 1425, 1434–35 (5th Cir.1983); *Ross v. Houston Independent School District,* 699 F.2d 218, 226 (5th Cir.1983). As Justice Powell said, to expect a total absence of one-race schools would deny the demographic and economic realities of most major cities. *See Estes v. Metropolitan Branches of the Dallas NAACP,* 444 U.S. 437, 445–46, 100 S.Ct. 716, 720–21, 62 L.Ed.2d 626 (1980) (Powell, J., dissenting from dismissal of writs of certiorari as improvidently granted).

To determine whether the Boston school system has an impermissible number of

---

**5.** The State Board, in an attempt to distinguish *Spangler,* emphasizes that the Supreme Court itself noted that its decision did not involve "'step at a time' plans by definition incomplete at inception," *Spangler,* 427 U.S. at 435, 96 S.Ct. at 2704, the approach used for the desegregation of Boston's public schools. By mentioning that the case did not involve a step-at-a-time plan, however, the Court was simply recognizing the unremarkable proposition that where such a plan is involved, the mere implementation of an individual court order—a "step"—does not necessitate a finding of unitariness. But where unitariness has been achieved, as to either the entire school system or a wholly separable sub-

set thereof, we believe *Spangler* is applicable regardless of what desegregation approach was employed.

The Board's other attempts to distinguish *Spangler*—that the schools there were in "literal compliance" with the court's orders, and that the challenged order itself provided little flexibility—similarly fail to recognize that unitariness itself is the touchstone of *Spangler.*

**6.** While there is a literal distinction between one-race and racially identifiable schools, we follow the courts' tendency to use the phrases interchangeably.

one-race or racially identifiable schools, we must determine the percentage of students of one race that brings a school within that category. Courts have applied different percentages. *See Davis*, 721 F.2d at 1431 (noting expert's use of 90 percent figure); *Singleton v. Jackson Municipal Separate School District*, 541 F.Supp. 904, 910 (S.D. Miss.1981) (90 percent); *Estes*, 444 U.S. at 442, 100 S.Ct. at 718 (Powell, J., dissenting) (noting application of 75 percent figure); *Riddick*, 784 F.2d at 533 n. 13 (70 percent). We do not believe that a measure as low as 70 percent or 75 percent would be appropriate for the Boston schools. Given the racial concentration that exists within certain of the court-drawn school districts, such a low figure would cause many schools to be deemed one-race even if their student body reflected the population of the court-established district in which they operate.[7] Although this problem is not entirely avoided by resort to an 80 percent cutoff, it is substantially mitigated.

■ We decline to decide whether 80 percent or 90 percent is a better gauge of racial identifiability in the Boston schools, for under either standard we do not find that the number of one-race schools indicates a constitutionally impermissible level of segregation. According to the February 1, 1985, State Board monitoring report, which provides data on the most recent student enrollments in the record, of the 118 public schools in Boston only *one*, the Cheverus Middle School, has a student body of more than 90 percent one race. Massachusetts Board of Education, *Report No. 4 on Boston School Desegregation, Volume II*, at 29 (1985) (hereinafter "Re-

port No. 4"). The Cheverus Middle School, which is 91 percent white, is nonetheless fully in compliance with the district court's orders: it is located in East Boston, a locale that has been excluded from much of the court's remedial plan because of its unique geographic isolation caused by the Boston Harbor. *See Morgan v. Kerrigan*, 401 F.Supp. at 238–40 (discussing East Boston's unique situation).

Using an 80 percent measure, the number of racially identifiable schools rises to 13.[8] However, all these schools are in compliance with the district court's desegregation orders. *Report No. 4* at 28–29, 35–36. Nine of the 13 are elementary schools, in which the age of the students prevented use of the full panoply of integrating tools. Eight of these schools, all with an enrollment at least 80 percent black, are in districts 4 and 5, which encompass the most heavily black sections of Boston. *Id.* Each of the remaining five schools, in which whites constitute at least 80 percent of the student body, is located in geographically isolated East Boston.

Applying either an 80 percent or 90 percent standard, and taking into account that all of the one-race schools are in compliance with the court's orders, it does not appear that the number of one-race schools in Boston precludes a finding of unitariness in the student assignment process. The record reveals no ground for believing that any of the 13 one-race schools can or will be further desegregated if the court's presence continues. *See, e.g., Ross v. Houston Independent School District*, 699 F.2d 218, 226 (5th Cir.1983). As noted, each of the

7. For example, blacks constitute 72 percent of the public middle school students residing in district 4. *Morgan v. Nucci*, No. 72–911–G, slip op. at 6 (D.Mass. May 24, 1985). Obviously, for every middle school in district 4 to avoid a student body consisting of not more than 70 percent black would be impossible, absent interdistrict busing. Moreover, staying below the 75 percent ratio, although theoretically possible, would allow for so little variance as to be impossible as a practical matter. It should be borne in mind, when we speak of "districts," that these are districts that were drawn by the district court specifically for desegregation purposes, hence they may be presumed to be based on an intensive effort to include, insofar as

Boston's settlement patterns will allow, a comprehensive racial mix.

8. The schools are Thompson Middle (82 percent black); Wilson Middle (80 percent black); Barnes Middle (82 percent white); Cheverus Middle (91 percent white); Chittick Elementary (85 percent black); Taylor Elementary (83 percent black); Endicott Elementary (80 percent black); Murphy Elementary (80 percent black); Adams Elementary (82 percent white); Bradley Elementary (85 percent white); Kennedy Elementary (89 percent white); and O'Donnell Elementary (84 percent white).

schools is in compliance with the court's own student assignments order. It would be illogical to use the racial identifiability of such schools as a reason for continuing a plan which can only offer more of the same. We interpret the absence of any requirements in the court's orders that would lessen the racial identifiability of these schools as reflecting the district court's belief that further racial balancing is not reasonably possible. We must presume that racial imbalance in the 13 schools is rooted not in discrimination but in more intractable demographic obstacles.

### (2) Good Faith

■ Unitary status is not simply a mathematical construction. One non-quantitative factor of particular significance is whether the school defendants have a sufficiently well-established history of good faith in both the operation of the educational system in general and the implementation of the court's student assignment orders in particular to indicate that further oversight of assignments is not needed to forestall an imminent return to the unconstitutional conditions that led to the court's intervention. *See Morgan v. McDonough*, 689 F.2d 265, 280 (1st Cir.1982) ("the ending of obstructionism plainly signals a return to greater local control"). *See also Ross*, 699 F.2d at 225; *Whittenberg v. School District*, 607 F.Supp. 289, 299 (D.S. C.1985).

The relevance of good faith underscores the notion that unitariness is less a quantifiable "moment" in the history of a remedial plan than it is the general state of successful desegregation. Courts have recognized that the mere adoption of a racially neutral remedial plan is not tantamount to desegregation. *See Ross*, 699 F.2d at 225 ("A school system is not ... automatically desegregated when a constitutionally acceptable plan is adopted and implemented, for the remnants of desegregation are not readily eradicated."); *Lemon v. Bossier Parish School Board*, 444 F.2d 1400, 1401 (5th Cir.1971) ("One swallow does not make a spring."). Thus, where a court has reason to believe that a discriminatory animus still taints local decisionmaking, it may be appropriate for the court to retain jurisdiction for some period after neutral procedures have been implemented. A finding of good faith, on the other hand, reduces the possibility that a school system's compliance with court orders is but a temporary constitutional ritual.

Our review of the record here suggests that the school defendants have performed in good faith in recent years. Such good faith was conspicuously absent, to be sure, from the inception of the Boston case in 1972 through much of the 1970s; at nearly every turn, the school defendants of that era resisted the district court's attempts to remedy the unconstitutional segregation then afflicting Boston's schools. *See Morgan v. Kerrigan*, 401 F.Supp. at 224–27; *Morgan v. Hennigan*, 379 F.Supp. at 418–21, 429–32, 438–41, 451–56, 477. By 1982, however, personnel changes and improved attitudes led both the district court and this court to comment on the responsible approach the school defendants were exhibiting towards the running of the school system and the implementation of the district court's orders. *See, e.g., Morgan v. McDonough*, 689 F.2d 265, 280 (1st Cir.1982). This was true on the date of the orders under review. *See, e.g., Morgan v. Nucci*, 620 F.Supp. 214, 228–29 (D.Mass.1985) (defendants during the past year "have proved in many ways their commitment to desegregation and intention to complete implementation of the student desegregation plan").

Other factors also point to a finding of good faith on the part of the school defendants. First, as we explain below, the last monitoring report filed by the State Board concluded that defendants had fully complied with the court's student assignment orders. Moreover, blacks and other minorities have assumed some positions of responsibility within the school system. Minority presence in the power structure is a factor that might be expected to help prevent regression to a dual system once the court's presence is withdrawn. *See Riddick*, 784 F.2d at 528 (noting that the racial integration of Norfolk's school board made discriminatory funding unlikely).

Subject to the district court's further assessment on remand, we believe the record tends to show that the school defendants have exhibited a degree of good faith consistent with a finding of unitariness.[9]

(3) Maximum Practicable Desegregation

After finding segregation in a school system, the courts are charged with supervising the dismantling of the dual system and eliminating the effects of past discrimination. The ultimate remedial goal has been defined as the attainment of "maximum practicable desegregation." *Morgan v. McDonough*, 689 F.2d 265, 280 (1st Cir. 1982)ˉ (quoting *Morgan v. Kerrigan*, 530 F.2d at 417 n. 20). *See also Ross*, 699 F.2d at 227 ("[whether] public officials have satisfied their responsibility to eradicate segregation and its vestiges must be based on conditions in the district, the accomplishments to date, and *the feasibility of further measures*") (emphasis supplied). The present record suggests that the Boston schools have reached this goal in regard to student assignments.

The district court, however, justified its retention of jurisdiction over student assignments on the express ground that "the schools have never fully implemented the 1975 student desegregation plan with respect to assignments." *Morgan v. Nucci*, 620 F.Supp. at 218. The court said this finding was supported by the State Board monitoring reports. *Id.* The court also referred to its May 24, 1985, memorandum asserting that the school defendants had failed to comply with court-ordered racial/ethnic guidelines by consistently assigning too many black students and too

few white students to three named schools and too many whites and too few blacks to four other named elementary schools.

The 1985 monitoring report of the State Board, however, seems to tell a different story. In that report, the State Board found that "*Compliance* [exists] with respect to Assignment Process," referring to the 1975 student assignment plan. *See* Massachusetts Board of Education *Report No. 5 on Boston School Desegregation, Volume I*, at 7 (1985) (hereinafter *Report No. 5*). It is true that the text accompanying this finding makes clear that while compliance exists with respect to the *assignment process*, the State Board could not assess whether actual *enrollments* fell within the court's orders. But the State Board also intimated that any deficiency in enrollments was likely due to circumstances beyond the school defendants' control: "[b]ecause of the history of 'shrinkage' of white numbers between the assignments and the actual enrollments ..., no attempt will be made to determine overall compliance with Court-established racial/ethnic guidelines until fall enrollments are available." *Id.*

The State Board's 1985 finding of compliance in the assignment process is significant. Since 1975, the school defendants have been under an obligation to implement an assignment plan drawn by the court. They have substantially complied with these orders.[10] If the divergence between assignments and actual enrollments is due, as the State Board's report suggests, to "white flight" or other causes for which

---

**9.** We recognize that not all the district court's orders have been fully implemented. For example, the school defendants have not complied with the court's orders requiring active recruitment of minority faculty members. *See infra* Part III. Although enough to warrant the court's retention of jurisdiction over staffing practices, this noncompliance, by itself, does not require an inference of overall bad faith. In the absence of countervailing evidence, we are likewise unable to see that defendants' failure to implement fully the special desegregation measures was indicative of bad faith.
*See Morgan v. Nucci*, No. 72–911–G, slip op. at 7–8 (D.Mass. May 24, 1985) (discussing special desegregation measures). Under these orders, the court directed that four elementary and two

middle schools be the subject of special recruitment efforts to attract white students. We do not believe that this apparently isolated instance of noncompliance with these orders warrants an inference of bad faith in the execution of student assignment orders. *See infra* subsection (4).

**10.** We recognize that a finding of maximum practicable desegregation does not invariably follow from the mere implementation of a desegregation order. Such an inference is more compelling, however, where, as here, the district court has indicated that noncompliance with details of the order is all that stands between the schools and full desegregation.

the school defendants are not responsible, the school defendants can hardly be held accountable. *See Swann,* 402 U.S. at 23, 91 S.Ct. at 1279 (1971) (courts' objective "does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools"). As the Fifth Circuit Court of Appeals has pointed out, "[w]hile those charged with desegregation must not shrink from the threat of white flight, school officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to those who vote with their feet." *Ross v. Houston Independent Schools,* 699 F.2d 218, 225 (5th Cir.1983). *See also Morgan v. Kerrigan,* 530 F.2d 401, 422 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976).

This is not to reject all consideration of actual enrollments as a further check on the effectiveness of the assignment process. If the actual enrollments flowing from a remedial plan were to permit the continuance of a dual system, a court might question the plan itself, assuming it were being followed, as the State Board found here. But the record here indicates that the once segregated Boston schools have achieved a substantial degree of racial integration.

*a. Actual Enrollments*

In its February 1985 monitoring report, the State Board prepared tables explaining the degree of compliance, for the 1984 school year, with the court's assignment guidelines as measured by actual enrollments.[11] *Report No. 4, Volume II,* at 20–48 (1985). The State Board found that only three of the 14 high schools were unjustifiably out of compliance, and none of these by more than two percentage points.[12] It is significant that all of the high schools that were technically out of compliance had too few whites; this is consistent with the State Board's explanation that enrollments may fail fully to reflect assignments because of the shrinking white school population. With the exception of the geographically isolated East Boston High, *no* high school was more than 34 percent white, and only two were more than one-quarter white. These facts suggest that little more can be done to integrate these schools given the available numbers of white students.

The middle school findings were similar. The Board found that of the 26 middle schools, 11 had actual enrollments unjustifiably out of compliance—three as to black enrollment,[13] seven as to white,[14] one as to other minority.[15] Again, none of these schools had *too many* whites. Indeed, the State Board concluded that noncompliance with the court's assignment orders was inevitable in the middle schools. It wrote, "[t]he impact of admissions to [exam schools] Boston Latin School and Latin Academy at the seventh grade is such that compliance *cannot* be achieved for White enrollment in all district middle schools." *Report No. 4* at 6 (emphasis in original).

11. Report No. 4 contains the most recent enrollment figures in the record.

12.
| School | Court-Ordered White Range | Actual White Enrollment |
| --- | --- | --- |
| Madison Park | 21%–31% | 19% |
| English High | 21%–31% | 20% |
| Burke High | 13%–23% | 12% |

13.
| School | Court-Ordered Black Range | Actual Black Enrollment |
| --- | --- | --- |
| Wheatley | 48%–54% | 57% |
| Umana | 48%–54% | 56% |
| Lewenberg | 41%–69% | 77% |

14.
| School | Court-Ordered White Range | Actual White Enrollment |
| --- | --- | --- |
| T. Roosevelt | 16%–26% | 14% |
| R. Shaw | 27%–45% | 25% |
| Thompson | 18%–30% | 15% |
| Cleveland | 12%–20% | 11% |

15. See note 15 on page 324.

Discrepancies in the enrollment figures at elementary schools are somewhat greater.' Although only 11 of 78 elementary schools are unjustifiably out of compliance,[16] the degree of noncompliance is generally more pronounced. Seven of the 13 schools vary from the designated range by at least five percentage points,[17] and one school exceeds the court's assignment guidelines by 18 points. Still, only one elementary school outside of East Boston is more than 50 percent white and just five have a student body in excess of 40 percent white. The elementary school enrollment may not be in literal compliance with the district court's assignment orders, but there is nothing to suggest that the variation is a by-product of a successful attempt to maintain enclaves of segregation.

The foregoing data suggest that while actual enrollments have not in all instances turned out to reflect the district court's plans, the degree of overall divergence is relatively small. We are not persuaded that such a limited degree of noncompliance is sufficient to justify the court's continuing assignment orders.

We have two final observations on actual enrollments.

First, it is maximum *practicable* desegregation that the law requires. This is a practical, not a theoretical standard. A court should not remain involved in the assignment process indefinitely merely because some further degree of compliance with assignment standards is conceivable. *See Calhoun v. Cook*, 525 F.2d 1203, 1203 (5th Cir.1975) ("[i]t would blink reality and

authority ... to hold the Atlanta School System to be nonunitary because further integration is theoretically possible"). A realistic approach, moreover, serves the broader objective of ensuring that the courts do not intervene in school affairs any longer than is strictly necessary.

Here, the district court predicated its retention of jurisdiction primarily on defendants' believed failure to implement fully the 1975 assignment plan. Little in the record suggests, however, that implementation beyond what presently exists is likely to be obtained. Student assignment orders have been in effect since the start of this suit's remedial phase in 1975. Over recent years, school defendants have attempted in good faith and with considerable success to make attendance patterns conform to the court's guidelines. While the goal of absolute compliance everywhere in the city may have remained elusive, no evidence has been presented to indicate that absolute compliance will become any more attainable in the future, nor has the court made findings or included specific instructions in its orders such as might be expected if it felt that school authorities were guilty of readily correctible errors. Moreover, merely retaining the same guidelines for the coming years offers no cure for such shortfalls as now exist. The hope of fuller compliance is insufficient to justify the court's imposition of perpetual assignment orders As Justice Powell stated, "perfect solutions may be unattainable in the context of the demo-

| School | Court–Ordered White Range | Actual White Enrollment |
|---|---|---|
| Dearborn | 29%–49% | 25% |
| Michelangelo | 14%–24% | 10% |
| Timilty | 14%–24% | 13% |

**15.** Other minority students comprised 23 percent of the Lewis Middle School's student body; the court-imposed range was 24 percent to 40 percent.

**16.** The schools are F.D. Roosevelt, Winthrop, Channing, Chittick, Conley, Grew, Hemenway, Emerson, Perkins, Perry and Russell.

**17.** All of the schools failed to comply as to white enrollments.

| School | Range | Actual Enrollment |
|---|---|---|
| Chittick | 16%–26% | 4% |
| Emerson | 26%–44% | 17% |
| Grew | 16%–26% | 32% |
| Hemenway | 16%–26% | 34% |
| Roosevelt | 16%–26% | 44% |
| Perkins | 26%–44% | 50% |
| Perry | 26%–44% | 57% |

graphic, geographic, and sociological complexities of modern urban communities." *Estes v. Metropolitan Branches of the Dallas NAACP*, 444 U.S. 437, 448, 100 S.Ct. 716, 722, 62 L.Ed.2d 626 (Powell, J., dissenting from the dismissal of writs of certiorari as improvidently granted).

Second, even if some upgrading of attendance patterns were reasonably possible, such fine tuning would not warrant the court's continued indefinite involvement. Both the Supreme Court and this court have repeatedly stated that a judicially imposed desegregation remedy goes too far if it attempts to engineer some sort of idealized racial balance in the schools. *See Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 434–35, 96 S.Ct. 2697, 2703–04, 49 L.Ed.2d 599 (1976); *Milliken v. Bradley*, 418 U.S. 717, 740–41, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974); *Swann*, 402 U.S. at 24, 91 S.Ct. at 1280; *Morgan v. McDonough*, 689 F.2d 265, 275 (1st Cir. 1982). *See also Ross v. Houston Independent School District*, 699 F.2d 218, 227–28 (5th Cir.1983); *United States v. South Park Independent School District*, 566 F.2d 1221, 1225 (5th Cir.), *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978).

The most recent State Board monitoring reports on actual enrollments demonstrate that the degree of noncompliance with the court's assignment orders is relatively slight. The few schools that are unjustifiably out of compliance vary from the acceptable, court-imposed range by an average of four percentage points. For the court to continue its involvement in student assignments, even though the schools are effectively desegregated, primarily to ensure that a school such as Winthrop Elementary lowers its black enrollment from 50 percent to 46 percent, strikes us as the type of precision engineering that exceeds the court's authority.

Thus, even looking at actual enrollments, it appears that the defendants have demonstrated that they have met their constitutional obligation to desegregate the student bodies of Boston's public schools.

(4) Other Considerations

In deciding to retain jurisdiction over student assignments, the district court did not rely exclusively on the perceived failure of the schools to fully implement the student assignment plan. The court advanced three additional reasons that it believed made disengagement unadvisable: (1) the trend towards black racial identifiability in districts 4 and 5; (2) the absence of a unified facilities plan; and (3) the need for further monitoring. *See Morgan v. Nucci*, No. 72–911–G, slip op. at 7–10 (D.Mass. 1985), *noted in Morgan v. Nucci*, 620 F.Supp. at 218, 220. We believe that none of these justifies the court's continuing jurisdiction over student assignments.

In May 1985 the district court stated that school defendants were responsible for the trend toward racial identifiability in districts 4 and 5 by their failure to adopt "special desegregation measures." *Morgan v. Nucci*, No. 72–911–G, slip op. at 7–8 (D.Mass. May 24, 1985). These orders required the school defendants to "formulate and implement special measures" for the desegregation of designated schools. *See Morgan v. Nucci*, No. 72–922–G, slip op. at 43 (May 6, 1977); *Morgan v. Nucci*, No. 72–911–G, slip op. at 25 (May 3, 1976). The orders contain no further description of the anticipated special measures. Insofar as we can tell, they are plans to be developed by the school defendants themselves, to try to attract more white students to attend these schools voluntarily. Failure to implement such uncertain if commendable remedies does little to demonstrate the school defendants' essential lack of good faith. We note that the State Board declined in its monitoring report to treat the lack of activity in this area as a "noncompliance" with the court's orders. *See Report No. 5, Vol. I*, at 9–11.

Nor do we find that defendants' failure to create a unified facilities plan (UFP) prohibits a finding of unitariness in student assignments. Although poor upkeep of the schools may impede desegregation, the answer to that problem lies in relief aimed at providing a proper level of maintenance. As discussed later in this

opinion, *see infra*, Part IV, defendants are currently developing a UFP. If the UFP will indeed aid further desegregation in student enrollments, this result will occur independently of the district court's involvement in student assignments. The court cannot refuse to disengage from the assignment process merely because a UFP has not yet been created. *See Spangler*, 427 U.S. at 436–38 & n. 5, 96 S.Ct. at 2704–06 n. 5.

■ Similarly, we think it obvious that the need for further monitoring, *Morgan v. Nucci*, 620 F.Supp. 214, 218 (D.Mass.1985), does not prevent a finding of unitariness relative to assignments. The schools are either unitary or not in respect to student assignments. Monitoring—even less than the other pieces of unfinished business such as the securing of more minority teachers—does not demonstrate the need for a continued injunction relative to student assignments.[18]

### (5) Conclusion

In 1982, the district court wrote that "[t]he vestiges of pervasive and long-standing purposeful discrimination in public education are neither simply nor quickly eradicated." *Morgan v. McDonough*, 554 F.Supp. 169, 170 (D.Mass.1982), *aff'd*, 726 F.2d 11 (1st Cir.1984). No one can doubt the truth of that proposition. The desegregation of Boston's student assignment process has been ongoing for more than 12 years. This task has been the focal point of the entire case, and has engendered more controversy and resistance than any other aspect of the court's supervision of the Boston public schools. Yet, through the diligent efforts of the district judge and the parties, the schools have undergone a major transformation.

As we have demonstrated, the record before us suggests that the schools have attained unitary status in student assignments. The public officials charged with operating the schools have, in recent years, proven their commitment to eliminating racial discrimination in the educational system. Under the court's guidance, they have succeeded not only in dismantling virtually all the one-race schools the system had once maintained, but appear also to have made the schools as desegregated as possible given the realities of modern urban life.

We therefore find it difficult to see any basis for the perpetuation of an injunction requiring adherence to a particular formula for student assignments. We recognize, however, that the district court has greater familiarity with the facts of the case than we do. There is the possibility that factual considerations touching on the assignment issue may not have been fully examined. Thus, in vacating the student assignment orders, we authorize the court, on remand, to hold a further hearing on whether the schools have reached unitariness in student assignments. If the court expressly finds on the basis of facts not adequately or accurately canvassed herein that unitary status has *not* yet been achieved in the student assignment area, it may, subject to our later review, enter the same or different remedial orders relative to student assignments. Otherwise, the injunctive orders addressing the student assignment process shall remain vacated.[19]

---

**18.** Appellees advance other justifications for the court's involvement in student assignments, including the need to provide support services to students attending examination schools, alleged concerns with bilingual and vocational education, and defendants' need to implement various modifications to the student assignment plan. We do not consider any of these contentions sufficient to warrant further court supervision over the assignment process, especially in light of the evidence showing the substantial desegregation present in the Boston schools.

**19.** We have no reason to question the good faith of the present Boston school officials, *see supra*, or to doubt that the return to local autonomy will do anything but preserve the gains the schools have made over the past 15 years. Nevertheless, if unforeseen circumstances should ever necessitate a return trip to federal court by school plaintiffs, we note without deciding the possibility that the history of this litigation might militate for some modification of plaintiffs' evidentiary burden. *See generally* Note, *Allocating the Burden of Proof After a Finding of Unitariness in School Desegregation Litigation*, 100 Harv.L.Rev. 653 (1987).

### III. FACULTY AND STAFF DESEGREGATION

We turn next to the Boston Teachers Union's Appeal from final orders in the area of faculty and staff hiring. Such orders are not unusual in desegregation cases. Courts have long recognized that intentional segregation within a school system cannot be eradicated simply by racially balancing the assignment of *students* within the different schools. Bias in the hiring of faculty and staff can intensify the evils of a segregated educational environment. *See United States v. Montgomery County Board of Education*, 395 U.S. 225, 232, 89 S.Ct. 1670, 1674, 23 L.Ed.2d 263 (1969) (desegregation of school personnel is critical to "the basic task of achieving a public school system wholly free from racial discrimination").

Since this case began in 1972, the district court has wrestled with this problem in the Boston schools. In 1974, the district court found not only that black faculty and staff had been kept to disproportionately low numbers through intentionally discriminatory hiring practices but also that those persons hired had generally been assigned to predominantly black schools. *Morgan v. Hennigan*, 379 F.Supp. 410, 456–66 (D.Mass.1974). On appeal, this court acknowledged those findings and noted that the effect of those policies was to "isolate black students, black teachers and black administrators in a limited number of schools, thereby denying to those students the equal educational opportunity to which they are constitutionally entitled." *Morgan v. Kerrigan*, 509 F.2d 580, 597–98 (1st Cir.1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

To remedy these problems, the district court subsequently issued "Orders on Faculty Recruiting and Hiring," dated January 28, 1975. *Morgan v. Kerrigan*, 388 F.Supp. 581 (D.Mass.1975). These orders continued in effect a previous order requiring that the School Committee hire one black teacher for every white teacher hired until blacks constituted 20 percent of the total faculty (from 7.1 percent in the 1973–74 school year). *Id.* at 582, 585. These orders also required that the School Committee undertake an active recruiting program designed to attract black faculty to the Boston schools. The hiring and recruitment obligations would continue until 25 percent of the teachers in the Boston public schools were black. *Id.* at 584.

The Boston Teachers Union (BTU or Union) appealed from the district court's January 28, 1975, decree. The Union challenged, among other things, the legality of the 20 percent and 25 percent faculty ratios. This court rejected the Union's arguments. *Morgan v. Kerrigan*, 530 F.2d 431 (1st Cir.1976). Stressing that the district court has broad equitable power to eliminate segregation "root and branch," we held that the court had not abused its discretion by establishing the 20 percent and 25 percent hiring goals. *Id.* at 434. In February 1976, the district court entered an order providing similar hiring goals for black administrators. No appeal was taken from this order.

In 1978, the district court found that the defendants had not complied with its faculty recruitment and hiring orders. It therefore modified those orders to require that the percentage of black teachers increase annually by at least 1½ percent until black teachers constituted 20 percent of the total faculty. No appeal was taken from this directive. This requirement remained in effect until 1981, when layoffs caused by a budget crisis threatened recent gains in the percentage of black teachers and administrators.[20] Consequently, the court suspended the application of the affirmative recruitment obligation and ordered that any layoffs be conducted so as to preserve the existing ratios of black faculty and administrators, rulings we affirmed in *Morgan v. O'Bryant*, 671 F.2d 23 (1st Cir. 1982). While by this time the school defendants had attained, or were close to attaining, the 20 percent goal, they were

---

**20.** By 1981, blacks made up 19.09 percent of all teachers and 20.53 percent of school administrators. *Morgan v. O'Bryant*, 671 F.2d at 24.

still well short of the 25 percent measure which had been the court's ultimate aim.

After the budget crisis passed, the district court did not immediately reorder the School Committee to work towards the ultimate goal of 25 percent black faculty and administrators. Rather, the court allowed the Committee first to recall the tenured teachers, regardless of race, whose positions had been eliminated because of the fiscal squeeze. *See Morgan v. Nucci*, 620 F.Supp. 214, 227 (D.Mass.1985). But when the court issued its final orders in 1985—the orders challenged here—it reinstated the still unrealized 25 percent target for black faculty and administrators.[21] Paragraph 5 of the final orders, from which the Union appeals, requires that the school defendants

> shall achieve and maintain a desegregated faculty and administrative staff which are each comprised of not less than 25% blacks and 10% other minorities, by increasing the proportions of black faculty and administrative staff at a rate of not less than one-half percent annually and the proportion of other minority faculty at the rate of not less than one-quarter percent annually, and of other minority administrative staff in accordance with the parties' agreement for a one out of three hiring ratio, approved and ordered by the court on November 26, 1984 and July 5, 1985.

*Id.* at 216.[22]

Only the Boston Teachers Union—not the School Committee—has appealed from paragraph 5. Its principal contentions are five in number. First, the Union appears to argue that the essential "racial neutrality" of the School Committee's personnel practices amount to the achievement of uni-

tary status, thus precluding further judicial supervision in this area. Second, the Union claims the orders are a permanent injunction, impermissible under *Spangler*. Third, it claims the district court's exercise of "standby" jurisdiction here is improper.[23] Fourth, it contends the substance of the orders is beyond the court's power. And finally, the Union argues that the district court's failure to hold an evidentiary hearing renders the orders procedurally defective. We turn to these assertions.

### A. *Racial Neutrality*

The Union contends that the district court should have withdrawn jurisdiction over the school system's personnel practices because these practices are now "racially neutral." It finds support for this position in language from *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), where the Supreme Court struck down a district court's order that permanently mandated a particular racial mix in student assignments.[24] The Court stated that "having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violation on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy." *Id.* 427 U.S. at 436–37, 96 S.Ct. at 2705. Essentially, the Union claims that racial neutrality is tantamount to unitariness.

■ But the Union's argument—its reading of *Spangler*—proves too much. Racial neutrality is an unreliable talisman in the inquiry into unitary status; it is well established that a desegregation court is allowed—indeed required—to combat not

---

21. We note that from 1975 to 1985, the percentage of black students attending the Boston schools rose from 35 to nearly 50 percent. *Morgan v. O'Bryant*, 671 F.2d 23, 24 n. 2 (1st Cir. 1982).

22. The court subsequently added to paragraph 5 the requirement that the school defendants attain "at each of the three examination schools, a 25% black faculty within five years; and a 10% other minority faculty."

23. The Union does not only attack paragraph 5 as beyond the court's power, but attacks all the

other so-called "final" orders as similarly beyond the court's power. We only discuss paragraph 5, however, because the Union's right to intervene extended exclusively to faculty and staff issues. *See Morgan v. Kerrigan*, 509 F.2d 599, 600 (1st Cir.1975).

24. The order required that no school in the school district have a majority of any minority students. *Spangler*, 427 U.S. at 428, 96 S.Ct. at 2701.

only existing racial partisanship but also the lingering effects of past discrimination. *See Swann,* 402 U.S. at 28, 91 S.Ct. at 1282 ("The objective is to dismantle the dual school system."); *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) ("School boards ... [must] take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."). Thus, the fact that a particular school policy or program may be "racially neutral," in that it no longer reflects discriminatory animus, does not prove that the effects of prior discrimination have been purged. It was for this reason—to purge the Boston schools of the effects of its once discriminatory personnel policies—that the district court ordered, and we affirmed, the hiring goals the Union challenges here. *See Morgan v. Kerrigan,* 388 F.Supp. 581 (D.Mass.1975), *aff'd,* 530 F.2d 431 (1st Cir.1976).

■ In *Spangler,* moreover, the challenged order would have required the Pasadena schools to maintain a particular racial mix at each school "in perpetuity," as the Court put it, *even though the student assignment process had achieved unitary status. See Spangler,* 427 U.S. at 437, 96 S.Ct. at 2705 (noting that this aspect of the desegregation plan had been accomplished). Here, on the other hand, the makeup of the schools' faculty remains nonunitary judged by the standards established virtually at the inception of the desegregation process. And the record does not suggest these goals have become infeasible, a negative inference buttressed by the failure of the school defendants—who, after all, must execute the hiring orders—to appeal from this aspect of the final orders. *Accord Report No. 5, Volume II,* at 394 ("[w]hile the mandatory 20% level of black teachers has been maintained, little progress has been made towards the goal of 25%, and there were, for the first time in several years, real opportunities for such progress"). Absent the attainment of "maximum practicable desegregation" in a particular educational area, a district court has every right to require continued compliance with its outstanding orders.

### B. *The Orders' Permanence*

■ The Union objects to paragraph 5's command that the school defendants "achieve and *maintain* a desegregated faculty and staff." (Emphasis added.) It contends this is a permanent order of the type forbidden by the Supreme Court in *Spangler.* This court has stated, however, that the 25 percent black faculty ratio "provides a built-in terminus for court responsiblity." *Morgan v. Kerrigan,* 530 F.2d 431, 434 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976). The district court's final orders must be read in light of this statement. Once these goals have been adequately reached, the district court's role in the school's personnel policies will end, and we are confident the court will recognize its responsibility to terminate the injunction.[25] We therefore reject the BTU's contention that paragraph 5 impermissibly imposes permanent obligations on the school defendants.

### C. *"Standby" Jurisdiction*

The Union challenges the right of the district court to issue an injunctive order after removing the School case from its active docket. As previously explained, by late 1985 the district court had withdrawn jurisdiction over various facets of the Boston schools. In its memorandum regarding final orders, however, the court noted that "considerable unfinished business ... requires the court's retention of standby jurisdiction" in other areas. *Morgan v. Nucci,* 620 F.Supp. 214, 217 (D.Mass.1985). The court stated that faculty and staff

---

**25.** Although nothing in the orders of disengagement specifically provides for the court's terminating jurisdiction over particular aspects of the schools, as compared to the entire system, upon a showing of unitary status, we have no doubt that if the BTU or any defendant demonstrated complete compliance with all outstanding faculty and staff orders, the court would withdraw entirely from the school's staffing decisions. *See Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 436–37, 96 S.Ct. 2697, 2704–05, 49 L.Ed.2d 599 (1976).

desegregation, in particular, remained incomplete because the school defendants had not reached the previously established percentage goals. *Id.* at 218.

The court nevertheless stated that the case should be removed from its "active docket." Although a desegregated school system had not yet been attained, *see id.* at 217, the court found that defendants had recently demonstrated a commitment to carrying out the steps necessary to reach that goal. Thus, following the course adopted by the district court in *Swann v. Charlotte-Mecklenburg Board of Education,* 67 F.R.D. 648 (W.D.N.C.1975), the court took a middle ground: it imposed final orders designed to achieve unitary status, yet, by ending its active judicial control, left it largely to the defendants to implement the orders.

■ The Union contends that the district court has impermissibly placed the case in a judicial "no-man's land." It seems to believe that a court has but two legally permitted options: keeping a case on its "active docket" or total disengagement. We see no legal basis for imposing such a formalistic limitation on the broad remedial powers of a court of equity. *See Swann,* 402 U.S. at 31, 91 S.Ct. at 1283 ("substance, not semantics, must govern [the scope of a desegregation court's remedial power]"). Success in certain areas was a strong reason for the court to withdraw from an active management role, so as to allow the political officials charged with running the schools to exercise the proper responsibilities. On the other hand, where the school defendants had yet to achieve compliance with well-defined hiring goals that formed part of the original desegregation plan, it was reasonable for the court to enter these injunctive orders to take care of the remaining, uncompleted business.

The Supreme Court has repeatedly emphasized that once a finding of intentional segregation is made, courts must take "whatever steps might be necessary" to achieve a unitary system. *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). *See also Raney v. Board of Education,* 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1968) (a court should "retain jurisdiction until it is clear that disestablishment has been achieved"). We think the district court's decision to retain "standby jurisdiction" in order to secure compliance with its as yet unattained minority hiring orders was well within its equitable powers.

### D. *The Orders' Substance*

■ The BTU argues that specific parts of paragraph 5 are either impractical, beyond the established record, or suffer from some similar defect. We reject summarily those objections directed to parts of paragraph 5 that restate orders the Union has unsuccessfully challenged in the past. Thus, we do not consider the merits of the Union's challenge to the 25 percent black faculty and staff goal or to the inclusion of "other minorities" within the hiring orders.[26] The Union may not now collaterally attack these aspects of the orders, which are the "law of the case." *See Riddick v. School Board,* 784 F.2d 521, 531 (4th Cir.) ("principles of collateral estoppel or issue preclusion are applicable to school desegregation cases"), *cert. denied,* —— U.S. ——, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).

In light of the foregoing, we see only one requirement of paragraph 5 that may merit further discussion: the arguably novel

---

**26.** ·We sanctioned the 25 percent figure as an appropriate remedial target in *Morgan v. O'Bryant,* 671 F.2d 23, 27–29 (1st Cir.1982); *Morgan v. Kerrigan,* 530 F.2d 431, 434 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976).

In *Morgan v. Nucci,* 612 F.Supp. 1060, 1062 (D.Mass.1985), the district court concluded it had the power to "enter orders with respect to the employment of Hispanic and other minority faculty no less than its jurisdiction to enter orders regarding the employment of black faculty." No one, including the Union, appealed from these orders; nor does the Union contend it did not have a full and fair opportunity to litigate the issue whether "other minorities" were within the district court's remedial purview. *See generally Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979) (discussing preclusion).

mandatory annual percentage increases.[27] Although it is unclear whether the Union has mounted an independent challenge to these increases, appellees think they do, and it may be helpful to address the issue.

We review the mandatory annual increases for reasonableness, *see Swann,* 402 U.S. at 31, 91 S.Ct. at 1283; *Morgan v. O'Bryant,* 671 F.2d at 28, paying due deference to the district court's relative expertise in the area of desegregation remedies, *see, e.g., Columbus Board of Education v. Penick,* 443 U.S. 449, 469–70, 99 S.Ct. 2941, 2952, 61 L.Ed.2d 666 (1979) (Stewart, J., dissenting in part, concurring in part); *Morgan v. McDonough,* 689 F.2d 265, 275 (1st Cir.1982). In the area of faculty and staff desegregation, particularly, this district court's experience—both positive and negative—with its prior orders has educated it on such concerns as the availability of qualified minority applicants and the feasibility of specific percentage increases.

■ We think the school defendants' general history of noncompliance with court-ordered affirmative minority recruiting obligations, *see Morgan v. Nucci,* 620 F.Supp. at 226 n. 14; *Report No. 5, Volume II,* at 394–95, gave the district court ample justification for issuing specific numerical directives to the school defendants on how to reach the 25 percent goal. The court could not be expected to sit idly by while its outstanding orders remained unimplemented. And we have no reason to believe the actual increases imposed were unreasonable. The numbers seem reasonable on their face; the highest annual increase required by paragraph 5 is .5 percent, well below previous orders imposing such increases. We find it significant, moreover, that the district·court rejected a less gradual proposal advanced by the school defendants—the officials who must

implement the orders—that would have required the goals to be achieved by the 1988–89 school year.[28] In short, the district court's order, as evidenced in the attendant memorandum thoroughly explaining these increases, struck a reasonable balance.

### E.  *Procedural Challenges*

■ The BTU contends that the district court erred by refusing to conduct an evidentiary hearing on the appropriateness of what it labels the "permanent, faculty, racial quotas" compelled by paragraph 5. We find no merit to this argument. As explained above, virtually all of paragraph 5 merely restates orders still in effect from earlier phases of the litigation. Absent a significant change in circumstances, which the Union does not allege, the court did not need to hold hearings on those aspects of the final order.

■ The only arguably novel provision in paragraph 5 is the requirement of annual percentage increases in the number of black and other minority faculty and staff employed in the schools. The Union nowhere identifies how a hearing on this point would have assisted the court in making an informed decision. Indeed, we have little doubt that the court had ample information from which to assess the feasibility of its order. Through previous decisions on faculty and staff desegregation, the court had to consider the availability of qualified black and other minority applicants. Moreover, in its memorandum regarding final orders, the court demonstrated a thorough understanding of the year-to-year effect of its order, an understanding the Union does not contend was flawed. On this record, we do not believe that the court committed reversible error by declining to hold an evidentiary hearing.

27. The relevant portion of paragraph 5 orders the school defendants to increase "the proportions of black faculty and administrative staff at a rate of not less than one half percent annually and the proportion of other minority faculty at the rate of not less than one quarter percent annually, and of other minority administrative staff in accordance with the parties' agreement for a one out of three hiring ratio," until the 25 percent black and 10 percent other minority goals are achieved.

28. The court found that if its percentage increases were obeyed, paragraph 5 would be fully implemented by 1993–94. Moreover, the court believed that because of annual turnover, discharges would be required in only one year. *See* 620 F.Supp. at 226–27.

In conclusion, therefore, we reject the Union's challenges to paragraph 5 of the final orders relative to teachers and staff hiring.

## IV. FACILITIES

The city defendants have appealed from paragraph 5 of the district court's orders relating to the unified facilities plan (UFP). Paragraph 5 provides,

> The school defendants and city defendants shall comply with the second and third conditions contained in the State Board's vote of March 20, 1985, viz., "that there be a study of the long-term annual maintenance needs of the Boston Public Schools; that responsible Boston officials develop and implement a schedule of incremental appropriations to meet the maintenance needs identified in said study"; and said study shall begin immediately.

*Morgan v. Nucci,* 617 F.Supp. 1316, 1328 (D.Mass.1985). City defendants (whose principal concerns and responsibilities are financial) contend that the court exceeded its remedial authority by demanding that they develop and implement such a plan. School defendants, on the other hand, endorse the order. They say that it grew out of a lengthy history of city nonfeasance in the face of earlier promises and orders, and that even had the court not ordered the study, it is manifestly required for the proper administration of the schools. The city defendants implicitly acknowledge the wisdom of the study, for they have broadened its scope to encompass all city-owned facilities, including those unrelated to the schools.

■ We do not reach the merits of the city defendants' appeal because we conclude that no justiciable case or controversy exists. At oral argument, the parties informed us not only that the study had been commissioned, but that it was already substantially completed. We were also told that the final draft would be ready in April 1987, a date now passed. Thus, even if we were to agree with defendants that the court erred in ordering them to undertake a study of the schools' maintenance needs, the completion, or substantial completion, of the project renders us unable to fashion any meaningful relief. The appeal from that part of paragraph 5 must therefore be dismissed as moot. *See In re Continental Mortgage Investors,* 578 F.2d 872, 877 (1st Cir.1978). *See also In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 150–51 & 150 n. 6 (3d Cir.1986); *Public Media Center v. FCC,* 587 F.2d 1322, 1326 (D.C.Cir.1978).

■ A closer question is presented by the part of paragraph 5 ordering defendants to fund the maintenance needs identified in the study. If we were to assume that the district court would implement this directive literally and would deny to the city defendants an opportunity to be heard on the need for, and wisdom of, any of the expenditures the report may direct, this provision would be excessive. But as school counsel argue, it is unrealistic to suppose that if the city defendants object to funding any of the needs the report may identify, the lower court will refuse to hear them and to give specific consideration at that time to whether or not to order the funding of such needs. Moreover, if the court then directs the funding of a particular project, the aggrieved party may appeal to us. On this premise, it is premature to review the entirely generalized order. We are told that, in fact, many of the study's recommendations are likely to address basic maintenance needs of a relatively uncontroversial nature. Until the results of the study are known, and until one of the defendants actually objects to funding a particular proposal, no case or controversy sufficiently concrete to satisfy the requirements of Article III exists. *See Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 297–98, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979); *O'Shea v. Littleton,* 414 U.S. 488, 493–94, 94 S.Ct. 669, 674–75, 38 L.Ed.2d 674 (1974); *Alabama State Federation of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945). We accordingly dismiss the city defendants' appeal.

## V. CONCLUSION

We vacate the court's orders pertaining to student assignments and remand for further proceedings not inconsistent herewith.

We affirm the district court's order under paragraph 5 requiring the school defendants, in effect, to create a faculty and staff consisting of not less than 25 percent black and ten percent other minority personnel.

We dismiss the city defendants' appeal from the district court's order pertaining to the Unified Facilities Plan.

*So ordered.*